# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AARON ABADI,<br><br>       Plaintiff<br><br>V.<br><br>THE WALT DISNEY COMPANY, DISNEY PARKS AND EXPERIENCES WORLDWIDE INC., WALT DISNEY PARKS AND RESORTS U.S., INC., ROBERT CHAPEK both individually and in his capacity as Chief Executive Officer of The Walt Disney Company, JARED FIELDS, KERRY ALAN SCANLON, AUDREY PUMARIEGA ANGULO, MARGARET C. GIACALONE, JULIE H. MCCONNELL & NUMEROUS UNNAMED EXECUTIVES, EMPLOYEES, STAFF, & ATTORNEYS OF THE ABOVE COMPANIES.<br>                    Defendants. | CASE # _____<br><br><br><br><br><br><br><br><br><br><br>JURY TRIAL REQUESTED<br><br>March 2, 2022 |

## COMPLAINT

Plaintiff, Aaron Abadi, brings this action pro se, against defendants, THE WALT DISNEY COMPANY, DISNEY PARKS AND EXPERIENCES WORLDWIDE INC., WALT DISNEY PARKS AND RESORTS U.S., INC. (collectively referred to herein as "Disney"), and many of its employees, attorneys, executives and staff, alleging that defendants discriminated against him due to his disability, conspired to deny him his civil rights, and neglected to prevent interference with his civil rights, when they had that opportunity. The defendants that the Plaintiff is currently aware of, are listed herein. All other defendants will be added upon receipt of discovery.

Plaintiff requests injunctive relief, declaratory relief, compensatory damages, punitive damages, and any other relief that the court shall determine, and/or any relief that will become apparent and appropriate upon the exchange of discovery.

## PARTIES

1)    Plaintiff, Aaron Abadi, resides in the City of New York. His address is 82 Nassau Street, Apt. 140, New York, NY 10038.

2)    THE WALT DISNEY COMPANY is an internationally renowned company with offices around the globe and throughout the country. Its New York

City office is located at The Walt Disney Company 77 W 66th St New York, NY 10023.

3)    DISNEY PARKS AND EXPERIENCES WORLDWIDE INC. and WALT DISNEY PARKS AND RESORTS U.S., INC., are subsidiaries of The Walt Disney Company, and can be reached at that same address.

4)    ROBERT CHAPEK, Chief Executive Officer of The Walt Disney Company, is located at 500 SOUTH BUENA VISTA STREET BURBANK CA 91521. His telephone number is (818) 560-1000.

5)    JARED FIELDS is an employee of Disney in Florida, and can be reached at The Walt Disney Company headquarters, 500 S Buena Vista Street Burbank, CA 91521

6)    Margaret C. Giacalone, is the attorney for Disney, and can be reached at The Walt Disney Company headquarters, 500 S Buena Vista Street Burbank, CA 91521

7)    Julie H. McConnell is with McDermott Will & Emery LLP, located at The McDermott Building, 500 North Capitol Street, NW, Washington, DC 20001.

8)    Kerry Alan Scanlon, can be reached at and can be reached at The Walt Disney Company headquarters, 500 S Buena Vista Street Burbank, CA 91521

9)    Audrey Pumariega Angulo, is located at 333 SE 2nd Avenue, Suite 4500 Miami, FL 33131

10)     Plaintiff reserves the right to add numerous unnamed employees, executives, attorneys, and staff as defendants, as their names and contact information become  available during discovery.


## JURISDICTION & VENUE

1)     This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. 1331, which provides district courts with jurisdiction over civil actions arising under the United States Constitution or laws of the United States. Amongst other claims, Plaintiff is alleging violations of the federal ADA laws 42 U.S. Code § 12182, The Rehabilitation Act ("RA") of 1973 § 504, 29 U.S.C. § 794 (a), and 42 U.S. Code § 1985 - Conspiracy to interfere with civil rights.

2)      This Court has jurisdiction under 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000.

3)     This court has jurisdiction under 28 U.S. Code § 1369 C 2, as Disney does substantial business in New York City, and is currently building its new headquarters there.

4)     Venue is proper pursuant to 28 U.S.C. 1391(b) because the events giving rise to the allegations in this complaint occurred in this district. The notification and discrimination were done by email to Plaintiff in New York City.

## FACTUAL ALLEGATIONS

5)      Defendant Disney owns and operates a theme parks and resorts throughout the country.

6)      The Covid-19 virus that arrived from Wuhan, China, spread throughout the world, causing significant death and hospitalizations, during the end of 2019, though 2020, and continuing in 2021.

7)      The Center for Disease Control ("CDC") announced guidance for requiring all people to wear masks in public places. The guidance varied as the time progressed.

8)      Ultimately, the CDC guidelines, while allowing the relaxing of mask rules in most places, they continued to require it in certain venues.

9)      Although the states had mostly relaxed mask mandates, Disney continued to apply stringent mask requirements for all staff and guests.

10)      Throughout this pandemic, most, if not all mask mandates, mask guidance, and related laws, included wording to remind people that children under 2 years old and people with a disability that causes that the person cannot wear a mask, are exempt. The ADA put out a guide elaborating on the types of disabilities that would not be able to wear masks. It's named, "The ADA and Face Mask Policies" (Exhibit A). It says, "Some people with autism are sensitive to touch and texture. Covering the nose and mouth with fabric can cause sensory overload,

feelings of panic, and extreme anxiety." It recommends that they should not wear a mask.

11)     Plaintiff, Aaron Abadi, while he does not have autism, he does have sensory processing disorder, which is the actual disorder that an autistic child would have, if sensitive to touch to a point of possibly causing sensory overload.  It is listed on his medical records. Attached as Exhibit B & Exhibit C, are a doctor's letter and a copy of the medical chart from plaintiff's doctors, confirming this.

12)     Plaintiff states that he had this condition his entire life.  He could not wear glasses, sunglasses, baseball caps on his head and face, as it will cause a serious sensory overload.  He also has difficulties wearing neckties and starched shirts. Anything around the face or head is a serious problem.

13)     This is not simply a discomfort.  Our senses send messages to our brains, and when there's a dysfunction in those messages, the brain gets the wrong message.  When I try to wear a mask or any of those other items I mentioned, it starts off with extreme discomfort and pretty quickly turns into unbearable, where I will rip it off without any regard of the consequences.  It is also coupled with headaches and other irritation. I cannot wear a mask at all.

14)     As per ADA guidelines and Air Carrier Access Act ("ACAA") guidelines, which are almost identical in these aspects, this Petitioner should be exempt from wearing a mask. See the ADA and Face Mask Policies _ Southeast

ADA Center, where it clearly defines the sensory disability, and states that such a person should be exempt from mask rules. In any case, sensory processing disorder, when activated, creating sensory overload, it limits almost all major life activities, as the Petitioner cannot function, and thus it clearly fits the criteria set by ADA and ACAA.

15)    In clarifying the definition of disability, 28 CFR § 36.105 (1) says "Physical or mental impairment means: (i) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as: Neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine."

16)    Petitioner's disorder affects the body system related to the sense of touch, specifically, and is included in the above definition of disability. Touch is the ability to sense pressure, vibration, temperature, pain, and other tactile stimuli. These types of stimuli are detected by mechanoreceptors, thermoreceptors, and nociceptors all over the body, most noticeably in the skin. These receptors are especially concentrated on the tongue, lips, face, palms of the hands, and soles of the feet. The law recognizes that a disorder in the important sense of touch severely limits many major life activities.

17)     The Doctor's letter confirms that the Plaintiff already had Covid and was no longer contagious. The CDC states that Covid reinfection is rare (Exhibit D). This is not to say it cannot happen, but the public accommodation is responsible to apply logic and make an honest risk assessment. Under these circumstances, Plaintiff argues that without obvious symptoms, he cannot be considered a direct threat, which is defined as a significant risk, when it comes to disability laws.  It is certainly a good idea to increase precautions, but it doesn't create a direct threat, and therefore it doesn't allow discrimination.

18)     The Equal Employment Opportunity Commission ("EEOC") has a similar guidance to the effect that only those with Covid or its symptoms can be considered a direct threat (Exhibit E).

19)     It states the following: "These facts manifestly support a finding that <u>a significant risk of substantial harm would be posed by having someone with COVID-19, or symptoms of it, present in the workplace at the current time</u>." Without even symptoms there's no justification to consider me a "direct threat" AKA a significant risk.

20)     Now, for arguments sake, if you were to say that anyone <u>without</u> a mask is a direct threat, then you would have to prove that everyone <u>with</u> a mask, including all the most common masks that are useless, are suddenly no longer a direct threat.  Otherwise, that's discrimination.

21)     The medical community and including the CDC, the NIH, and the

WHO, evolved in regards to their expectations of the value of a typical face mask

in protecting people from Covid 19. Even to date, there is no clear peer-reviewed

study that can confirm the importance and benefits of wearing masks as is being

worn currently. The CDC themselves confirm that we do not have real evidence

(Exhibit F). Most of us say, it probably cannot hurt, although some studies say that

it can. Plaintiff is not looking to adjudicate that issue, if not requested to by the

court, or the Defendants.  Suffice it to say that the typical mask is questionable as

to its protection.

22)     Defendants Disney, the named others, and the unnamed other

defendants discriminated against Plaintiff, conspired to discriminate, and did not

attempt to stop the discrimination.

23)     There were many employees, staff, executives, and even attorneys that

were part of this conspiracy and/or participated in the discrimination. During

discovery, we will ask for that information, and add those defendants to this action.

24)     On August 27, 2021 I wrote an email to Disney (see Exhibit G for my

request and Disney's response), as I was planning to go to Disney World Resorts in

Florida or Disneyland in California, and stay at their hotels and go to the various

Parks, Stores, restaurants, and so on.  I was hoping to go in the end of September

or early October of 2021 with my children and grandchildren.   We have been

going there on average of about once every year for decades, and unfortunately, since Covid hit, we have not been able to go.

25)    In this email I explained that I have a sensory processing disorder and cannot wear a mask.  I notified them in advance by emailing the following. "I have a medical disability, specifically a sensory processing disorder, and I cannot wear a mask or a face shield. Attached is a copy of the letter from my doctor confirming the above, and attesting to the fact that I already had Covid. I am no longer a health risk. It is my understanding, that at your parks and facilities you require people to wear a mask currently. I would like to come to the park with my children, and to be accommodated so that I don't have to wear a mask. CDC guidelines and all state mandates exempt someone like me from wearing a mask when the mandates were in effect. Federal ADA laws require that a person with a disability is accommodated. Please confirm that if I booked a trip to Disney World or Disneyland, that I will be accommodated appropriately. Much appreciated, Aaron Abadi."

26)    They refused to allow me to stay or play at their hotels, resorts, parks, and entertainment properties.

27)    They Responded as follows: "Face coverings are required for all Guests (ages 2 and up) in all indoor locations, regardless of vaccination status. This includes upon entering and throughout all indoor attractions and indoor queues and

in Disney buses, monorail and Disney Skyliner, regardless of vaccination status. Face coverings are optional for Guests in outdoor areas. I recommend that you continue checking our 'Know Before You Go' website https://disneyworld.disney.go.com/experience-updates/ for the most up-to-date information regarding the face coverings requirement. Please know that our face coverings requirement is not in violation of the Americans with Disabilities Act (ADA), which we continue to follow in our accessibility policies. At this time, when individuals do not wear a face covering at the Walt Disney World Resort, it compromises the health and safety of other Guests and our Cast, and the ADA does not require accommodations that pose a direct threat to the safety of others. We understand that these times are challenging, and we appreciate everyone's cooperation and patience as we navigate as responsibly as we can. We are focused on consistent health and safety measures. I am truly sorry for how this may affect your family's vacation plans. If you have any further questions, I'm traditionally in the office on Sunday, Monday, Wednesday, and Thursday from 9:00 a.m. to 5:00 p.m. ET and can be reached by calling 407-828-1376. Aaron, thank you for your understanding and we hope you are able to visit the park with your family when these necessary precautions are lifted. Kind Regards, Jared Fields Guest Experience Services, Walt Disney World Resort, 407-828-1376."

28)     To me this felt like gaslighting, as it is very clear that I am not a "Direct Risk," as I already had Covid, and the CDC says, "Covid reinfections are rare."  Additionally, the EEOC clarified that you need symptoms to be considered a risk. I didn't have symptoms when I made the request, and I would never go if I had symptoms.

29)     Additionally, ADA's meaning of direct threat would not apply to masks for Covid, as the protection of a typical mask from Covid is negligible, as proven in multiple studies, and without any evidence of me having Covid, they cannot label me as a Direct Threat.  ADA law requires an individualized assessment, which was not done.

30)     I should be entitled to live and move around like other people.  State & Federal Law requires them to exempt me from a mask and accommodate me. I was discriminated against due to my disability, and my entire family had to suffer.

31)     As I read the response from Disney, I understood very clearly that I was not permitted to come to Disney without wearing a mask, and since I cannot wear a mask due to my disability. I cannot see any other way to read that response. Other families can all go to Disney.  I cannot go with my family due to my disability. That, to me, is a classic case of disability discrimination.

32)     I filed a complaint with the commissions on human rights, both in Florida and California, where the parks are located that I wanted to visit. Both commissions ultimately wrongfully dismissed my complaint.

33)     I have filed appeals for each of those dismissals, but in the interim I was told by the appeals division in California, that if I was planning to file in federal court, I should not wait, as the statute of limitations will not be paused.

34)     I attached a copy of each of my appeals filed with the exhibits and evidence that go along with them.  Exhibit H is for California, and Exhibit I is for Florida.  The Florida parks are known as Disneyworld, and the California parks are known as Disneyland.

35)     In California, the agency that handles such complaints is the Department of Fair Employment and Housing ("DFEH").  They dismissed my complaint because they wrongfully believed that it is acceptable to deny me access, since "Respondent demonstrated an affirmative defense involving the health or safety of an individual with a disability and the health or safety of others."

36)     That is an ambiguous abstract way of saying that all people are a direct threat, even without Covid, and even without any symptoms, unless they wear a mask and then they're good.  The science doesn't support that and neither does the law.  You can see my full response in the appeal document.

37)     In Florida, the agency that handles such complaints is the FLORIDA COMMISSION ON HUMAN RELATIONS (FCHR").  They dismissed my complaint, since I did not actually arrive at Disney and get thrown out.  They incorrectly believed that off-site discrimination is not discrimination. Please read the attached appeal.

38)     In it I write, The Florida Statute reads very clearly, 760.08 "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this chapter, without discrimination or segregation on the ground of race, color, national origin, sex, handicap, familial status, or religion."

39)     I am a person, I was denied the equal enjoyment of goods, services, facilities, privileges, advantages, and accommodations from Disney. I don't know what more can be required.

40)     National Federation of the Blind v. Target Corp., 452 F. Supp. 2d 946 - Dist. Court, ND California 2006. Shows that off-site discrimination is still discrimination.

"Off-Site Discrimination. The ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added). The statute applies to the services of a place of public accommodation, not services in a place of public accommodation. Id. To limit the ADA to discrimination in the provision of services occurring on the

premises of a public accommodation would contradict the plain language of the statute. See id.; see also Rendon, 294 F.3d at 1285' (holding that a process for selecting contestants for a game show that screened out the disabled was actionable under Title III even though the process occurred outside the premises of the public accommodation); Stoutenborough, 59 F.3d at 582-83 (emphasis added) (concluding that Title III covers "all of the services which the public accommodation offers"); Weyer, 198 F.3d at 1115 (holding that "whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services"). To the extent defendant argues that plaintiffs' claims are not cognizable because they occur away from a "place" of public accommodation, defendant's argument must fail."  National Federation of the Blind v. Target Corp., 452 F. Supp. 2d 946 - Dist. Court, ND California 2006.


Also see Rendon v. Valleycrest Productions, Ltd., 294 F. 3d 1279 - Court of Appeals, 11th Circuit 2002. "To contend that Title III allows discriminatory screening as long as it is off site requires not only misreading the relevant statutory language, but also contradicting numerous judicial opinions that have considered comparable suits dealing with discrimination perpetrated "at a distance." For cases arising under the ADA, see, e.g., Ferguson v. City of Phoenix, 157 F.3d 668 (9th Cir.1998) (hearing-disabled plaintiffs' ADA Title II challenge to 9-1-1 emergency response system that lacked TDD capacity[9]); Bartlett v. N.Y. State Bd. of Law Examiners, 226 F.3d 69 (2d Cir.2000) (dyslexic bar exam taker entitled to reasonable accommodations under Title II of ADA). For cases arising under the Civil Rights Act of 1964, see, e.g., Rousseve v. Shape Spa for Health & Beauty, Inc., 516 F.2d 64 (5th Cir.1975) (finding a violation where plaintiff's application to join health club was rejected on account of race); Smith v. Young Men's Christian Ass'n of Montgomery, Inc., 462 F.2d 634 (5th Cir.1972) (application to summer camp denied on account of race); Stout v. Young Men's Christian Ass'n of Bessemer, Ala., 404 F.2d 687 (5th Cir.1968) (application to join YMCA denied on account of race). None of these cases involved a physical barrier erected at the site of a public accommodation or public entity; rather, as in the present suit, they involve discriminatory screening methods used to deny access to a provided good, service, privilege or advantage.


41)     As is made clear in the above cases, as it is clear in the cases quoted

therein, and as simple logic dictates, a person who is told by email, phone or fax

that they're not welcome to come to or benefit from a public accommodation due to their disability, is discriminating and is in violation of any laws against discrimination, the same as if they came down in person and got denied access. There's no exclusion or rule written to require a physical site visit in order for the denial to be considered discrimination.

42)     It is a sad state of affairs when the very people entrusted to protect the disabled from discrimination can present such a farfetched idea, not communicate properly with the victim of the discrimination, and totally wash their hands from his situation.

43)     It is also a sad state of affairs when the company that was always supposed to be synonymous with family entertainment, has such little regard for people with disabilities.  Where countries with spotty human rights records treat the disabled better than Disney.

## **INJURIES & AFFECTS**

44)     The losses are financial, as I was denied basic services and privileges that all people have access to. Additionally, the emotional toll and anxiety caused from being discriminated against is significant, and probably much more than the financial.

45)     On average, I go with my family each year to visit a Disney park. For the last year and a half, I was denied that right.

46)     The benefits of utilizing public facilities have a value too.  For over 500 days I was denied access to their parks and resorts.

47)     Disabled people have a right to not be discriminated against.  Human beings have a right to be treated like human beings.  My rights were stripped from me.

## CAUSE OF ACTION

### COUNT ONE

48)     **Discrimination on the basis of disability in a public accommodation.** For the first count, Plaintiff alleges that defendants violated the Americans with Disabilities Act of 1990 on multiple occasions, specifically ADA Title III 28 CFR Part 36 - Nondiscrimination on the basis of disability by public accommodations and in commercial facilities.

49)     Plaintiff incorporates by reference the facts alleged in the earlier paragraphs for this count and for all counts listed thereafter.

50)     Plaintiff alleges that Defendants discriminated against him due to his disability and did not allow him equal access to the public accommodations described herein. Even to this date, the day of this being filed, Plaintiff was denied

access to all the locations mentioned, and that denial continues at the time of this filing.

51)     In defining public accommodation, it clarifies the following: 28 CFR Part 36 § 36.104 "Place of public accommodation means a facility operated by a private entity whose operations affect commerce and fall within at least one of the following categories…Place of lodging… A restaurant, bar, or other establishment serving food or drink…A motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;  An auditorium, convention center, lecture hall, or other place of public gathering… A park, zoo, amusement park, or other place of recreation… etc." As per this definition, the Disney facilities all fall under the term "public accommodations."

52)     The ADA states § 36.201(a) "Prohibition of discrimination. No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any private entity who owns, leases (or leases to), or operates a place of public accommodation." See § 36.202 for a breakdown of the various types of illegal discrimination, including: (a) denial of participation, (b) participation in unequal benefit, & (c) separate benefit. The above factual allegations show multiple violations of these laws.

53)     Disney has a stated policy that all people entering their locations must wear masks.  This was repeated to the defendant. The employees seem to believe that, Disney is a private company and they can create their own policy, whether or not it complies with the law.

54)     ADA law requires the Defendants to modify their policy to accommodate a person with a disability when they cannot wear a mask.  42 U.S.C. § 12182(a).[3] "The ADA defines discrimination to include: [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations...."

55)     In clarifying the definition of disability, 28 CFR § 36.105 (1) says "Physical or mental impairment means: (i) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as: Neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine."

56)     Plaintiff's disorder affects the body system related to the sense of touch, specifically, and is included in the above definition of disability. Touch is the ability to sense pressure, vibration, temperature, pain, and other tactile stimuli. These types of stimuli are detected by mechanoreceptors, thermoreceptors, and nociceptors all over the body, most noticeably in the skin. These receptors are especially concentrated on the tongue, lips, face, palms of the hands, and soles of the feet.

57)     While the Defendant's employees have suggested to Plaintiff that the reason of their discrimination is for safety, ADA Law § 36.301 (b) says, "A public accommodation may impose legitimate safety requirements that are necessary for safe operation. Safety requirements must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities." This requirement of actual risk is a very similar concept to the next paragraph, discussing direct threat.

58)     A public accommodation can deny access when there's a "direct threat." § 36.208 (b) "In determining whether an individual poses a direct threat to the health or safety of others, a public accommodation must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: The nature, duration, and severity of the risk; the probability that the potential injury

will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk." Defendant seemed to have believed that Plaintiff coming in without a mask will pose a direct threat.

59)    If the CDC believed that anyone without a mask was a "direct threat," they would have been careless and negligent in their duties to allow for such exemptions at all.  Even for eating and drinking, how can you kill people just because you want to eat and drink?! Obviously, the idea was to reduce the overall spread, and not to suggest that all people are a direct threat without a mask.

60)    It is understood from the previous paragraphs that a person, even without already having Covid, is not considered a direct threat or an actual risk, without any symptoms, and without any indication that they may have any disease, as the rate of transmission and the statistics showing the risk factor are relatively low, when avoiding people who are carrying the disease, maintaining a reasonable distance in general, and utilizing proper cleanliness.  Certainly, though, a person who already had Covid, as is the case with this Plaintiff, should not be considered a direct threat or an actual risk without clear symptoms, as the CDC confirms, "Covid reinfection is rare." (as shown above)

61)    The idea that masks are actually effective in reducing a direct threat, is debatable, at best. If an entity discriminates against a person with natural

immunity without a mask, treating him different and/or less than another person without natural immunity, but with a mask, that is discrimination.  If the fellow with the mask is not considered a direct threat, then the other fellow **with natural immunity without a mask is less of a threat.**

62)    The Supreme Court confirms that fear of a contagious disease in itself is not sufficient grounds to permit discrimination. "Allowing discrimination based on the contagious effects of a physical impairment would be inconsistent with the basic purpose of § 504, which is to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others." School Bd. of Nassau Cty. v. Arline, 480 US 273 - Supreme Court 1987. See the entire decision.

63)    This Court may grant relief: As in § 36.504 (a) "Authority of court. In a civil action under § 36.503, the court - (1) May grant any equitable relief that such court considers to be appropriate, including, to the extent required by the Act or this part - (i) Granting temporary, preliminary, or permanent relief; (ii) Providing an auxiliary aid or service, modification of policy, practice, or procedure, or alternative method…"

64)    Some of the defendants were directly discriminating, while others were aiding and abetting.

## **COUNT TWO**

65)     **Conspiracy to interfere with civil rights:** All the Defendants conspired to interfere with Plaintiff's civil rights, by conspiring to deprive him of his right to utilize their public accommodations, and by conspiring to deny him his rights in all the counts listed herein.

66)     42 U.S. Code § 1985 - Conspiracy to interfere with civil rights. "…if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

67)     Defendants conspired to deny the Plaintiff access to the Disney facilities, and conspired to discriminate against him due to his medical disability.

## COUNT THREE

68)     **Neglecting to Prevent Interference with Civil Rights.** Defendants were aware of the conspiracy to interfere with the civil rights of the disabled by banning Plaintiff and similarly disabled from accessing and visiting Disney, but did nothing to stop it. These Individual Defendants possess the power to stop the conspiracy, but have not taken any action to do so. This claim is thus ongoing and the statute of limitations does not apply.

69)    "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case…" 42 USC § 1986.

70)    Section 1986 creates a remedy against persons whose acquiescence make conspiracies to interfere with civil rights possible.

71)    Therefore, all to-be-named Individual Defendants in addition to the listed defendants are personally liable to Plaintiff for neglecting to prevent interference with his civil rights.


**COUNT FOUR**

72)    **STATE OF FLORIDA DISABILITY LAWS:** The Florida Statute reads very clearly, 760.08  "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this chapter,

without discrimination or segregation on the ground of race, color, national origin, sex, handicap, familial status, or religion."

73)     I am a person, I was denied the equal enjoyment of goods, services, facilities, privileges, advantages, and accommodations from Disney. I don't know what more can be required.

74)     Disney attempted to be excused, because it was not on site.  The discrimination happened off-site through email.

75)     Discrimination happens all the time by phone, by email, by social media. There's no statute or requirement that a person must be there in person in order to be considered discrimination.

76)     Discrimination is when someone is not treated equally. Disney should be required to treat me equal to someone else without a disability.  They did not. They said that I could not come because of my disability.

77)     A defendant, Target Corporation attempted to use a similar justification as the FCHR in federal court regarding an ADA discrimination complaint, and the court ruled against it.

78)     "Off-Site Discrimination. The ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added). The statute applies to the services of a place of public accommodation, not services in a place of public accommodation. Id. To limit the ADA to discrimination in the provision of services occurring on the premises of a public accommodation would contradict the plain language of the statute. See id.; see also Rendon, 294 F.3d at 1285' (holding that a process for

selecting contestants for a game show that screened out the disabled was actionable under Title III even though the process occurred outside the premises of the public accommodation); Stoutenborough, 59 F.3d at 582-83 (emphasis added) (concluding that Title III covers "all of the services which the public accommodation offers"); Weyer, 198 F.3d at 1115 (holding that "whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services"). To the extent defendant argues that plaintiffs' claims are not cognizable because they occur away from a "place" of public accommodation, defendant's argument must fail." **National Federation of the Blind v. Target Corp**., 452 F. Supp. 2d 946 - Dist. Court, ND California 2006.

79)     Also see **Rendon v. Valleycrest Productions**, Ltd., 294 F. 3d 1279 - Court of Appeals, 11th Circuit 2002. "To contend that Title III allows discriminatory screening as long as it is off site requires not only misreading the relevant statutory language, but also contradicting numerous judicial opinions that have considered comparable suits dealing with discrimination perpetrated "at a distance." For cases arising under the ADA, see, e.g., Ferguson v. City of Phoenix, 157 F.3d 668 (9th Cir.1998) (hearing-disabled plaintiffs' ADA Title II challenge to 9-1-1 emergency response system that lacked TDD capacity[9]); Bartlett v. N.Y. State Bd. of Law Examiners, 226 F.3d 69 (2d Cir.2000) (dyslexic bar exam taker entitled to reasonable accommodations under Title II of ADA). For cases arising under the Civil Rights Act of 1964, see, e.g., Rousseve v. Shape Spa for Health & Beauty, Inc., 516 F.2d 64 (5th Cir.1975) (finding a violation where plaintiff's application to join health club was rejected on account of race); Smith v. Young Men's Christian Ass'n of Montgomery, Inc., 462 F.2d 634 (5th Cir.1972) (application to summer camp denied on account of race); Stout v. Young Men's Christian Ass'n of Bessemer, Ala., 404 F.2d 687 (5th Cir.1968) (application to join YMCA denied on account of race). None of these cases involved a physical barrier erected at the site of a public accommodation or public entity; rather, as in the present suit, they involve discriminatory screening methods used to deny access to a provided good, service, privilege or advantage.

80)     As is made clear in the above cases, as it is clear in the cases quoted therein, and as simple logic dictates, a person who is told by email, phone or fax that they're not welcome to come to or benefit from a public accommodation due to their disability, is discriminating and is in violation of any laws against discrimination, the same as if they came down in person and got denied access.

There's no exclusion or rule written to require a physical site visit in order for the denial to be discrimination.

81)     It is a sad state of affairs when the very people entrusted to protect the disabled from discrimination can present such a farfetched idea, not communicate properly with the victim of the discrimination, and totally wash their hands from his situation.

82)     The remedies for such violations are as follows:

83)     FL Stat § 760.07 (2013)  "Remedies for unlawful discrimination.—Any violation of any Florida statute making unlawful discrimination because of race, color, religion, gender, national origin, age, handicap, or marital status in the areas of education, employment, housing, or public accommodations gives rise to a cause of action for all relief and damages described in s. 760.11(5), unless greater damages are expressly provided for. If the statute prohibiting unlawful discrimination provides an administrative remedy, the action for equitable relief and damages provided for in this section may be initiated only after the plaintiff has exhausted his or her administrative remedy. The term "public accommodations" does not include lodge halls or other similar facilities of private organizations which are made available for public use occasionally or periodically. The right to trial by jury is preserved in any case in which the plaintiff is seeking actual or punitive damages."

84)     Disney and the other defendants are in violation of the Florida discrimination laws as described in the statutes mentioned and the remainder of those laws.

**COUNT FIVE**

85)    **STATE OF CALIFORNIA UNRUH CIVIL RIGHTS**

**VIOLATIONS:**  State of California CIVIL CODE Section 51 (a)  "This section

shall be known, and may be cited, as the Unruh Civil Rights Act. (b)  All persons

within the jurisdiction of this state are free and equal, and no matter what their sex,

race, color, religion, ancestry, national origin, disability, medical condition, genetic

information, marital status, sexual orientation, citizenship, primary language, or

immigration status are entitled to the full and equal accommodations, advantages,

facilities, privileges, or services in all business establishments of every kind

whatsoever."

86)    In the State of California CIVIL CODE Section 51 (f) (AKA Unruh

Civil Rights Act) it says as follows: **"A violation of the right of any individual**

**under the federal Americans with Disabilities Act of 1990 (Public Law 101-**

**336) shall also constitute a violation of this section."**

87)    As is the case with most states, UNRUH was created to enforce, add

to, and make the ADA even more effective in the state.  The above shows that

Disney was in violation of the ADA and therefore they're automatically in

violation of UNRUH.

88)    All the defendants have violated these laws.

89)    Remedies provided are as follows: 52. (a) "Whoever denies, aids or

incites a denial, or makes any discrimination or distinction contrary to Section 51,

51.5, or 51.6, is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51, 51.5, or 51.6."

## COUNT SIX

90)    **Discrimination under a program receiving federal funds.**
**Defendants are in violation of The Rehabilitation Act ("RA") of 1973** § 504, 29 U.S.C. § 794 (a), which says, "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."

91)    Disney has been a recipient of significant federal funds during the Covid pandemic.  This will be proven after appropriate discovery.

92)    The discrimination issues are similar to those presented in the first count. "Although there are subtle differences between these disability acts, the

standards adopted by Title II of the ADA for State and local government services are generally the same as those required under section 504 of federally assisted programs and activities." Henrietta D. v. Bloomberg, 331 F. 3d 261 - Court of Appeals, 2nd Circuit 2003.

93)    These laws apply to the following entities: "(3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship— … or (ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation;" These would include the defendant.

94)    Plaintiff alleges that Defendant, Disney, with the assistance of the other defendants, discriminated against him due to his disability and did not allow him equal access to the public accommodations and as described herein.

95)    The remedies available to the court for both the ADA violations and the Rehabilitation Act violations are up to the court's discretion to award "such relief as may be appropriate," (42 U. S. C. § 2000c–7) as described in Barnes v. Gorman, 536 US 181 - Supreme Court 2002, "Section 202 of the ADA prohibits discrimination against the disabled by public entities; § 504 of the Rehabilitation Act 185*185 prohibits discrimination against the disabled by recipients of federal funding, including private organizations, 29 U. S. C. § 794(b)(3).

96)    Both provisions are enforceable through private causes of action. Section 203 of the ADA declares that the "remedies, procedures, and rights set forth in [§ 505(a)(2) of the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides" for violations of § 202. 42 U. S. C. § 12133. Section 505(a)(2) of the Rehabilitation Act, in turn, declares that the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available" for violations of § 504, as added, 92 Stat. 2983, 29 U. S. C. § 794a(a)(2). Thus, the remedies for violations of § 202 of the ADA and § 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d et seq., which prohibits racial discrimination in federally funded programs and activities."

### COUNT SEVEN

97)    **Civil action for deprivation of rights.**

98)    42 U.S. Code § 1983 - "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to

the party injured in an action at law, suit in equity, or other proper proceeding for redress."

99)    Defendant used the State regulations as it determined its applicability to deprive Plaintiff of his civil rights, and is therefore liable for this statute.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, Aaron Abadi, respectfully requests judgment in his favor, as follows:

A.    Compensatory damages for at least $200,000, of which the exact amount will be determined through discovery, at or before trial;

B.    Punitive damages as determined by the Court for the multiple counts where it is applicable;

C.    Declaratory relief, to clarify and declare that Plaintiff is exempt from wearing a mask and should be allowed to go anywhere and everywhere without harassment or discrimination; and that disability laws did not go into abeyance until Covid disappears.

D.    Injunctive relief requiring Disney to notify every employee, and staff member that disability laws are applicable to all, and that they are all required to become familiar with those laws.

E.     Injunctive relief to require Defendants to allow Plaintiff to enter all its facilities.

F.     Such other and further relief as the Court deems just and appropriate.


I understand that a false statement or answer to any question in this complaint will subject me to penalties of perjury. I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT. See 28 U.S.C. § 1746 and 18 U.S.C. § 1621.

I agree to provide the Clerk's Office with any changes to my address where case related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Respectfully submitted March 2, 2022,

/s/ Aaron Abadi
AARON ABADI, Plaintiff
82 Nassau Street Apt 140
New York, NY 10038
516-639-4100
Email:  aa@neg.com

 EXHIBIT A

**Information, Guidance and Training on the Americans with Disabilities Act**



Home » Disability Issues » The ADA and Face Mask Policies

## The ADA and Face Mask Policies

Updated: 8/27/2021

**Contents**

- Introduction
- May a federal, state or local government agency or a business require customers to wear a face mask?
  - Note: CDC Guidance
  - Updates (8/27/2021)
  - Court Cases: ADA and Face Masks
- Is there a reason a person might not be able to wear a face mask?
  - Examples of a person with a disability who might not be able to wear a face mask
- If a person with a disability is unable to wear a face mask, do I still have to allow them in my business or government agency?
- Are there any situations when an agency or business does not have to provide a reasonable modification to the face mask policy?
  - Fundamental Alteration
  - Undue Burden
  - Direct Threat
- How should I respond to a request for a reasonable modification to the face mask policy?
  - Best Practice Tip
- Summary & Resources
  - Citation
  - Endnotes
  - Disclaimer



## Introduction

The COVID-19 pandemic has changed our world in many ways. People with disabilities, people with chronic health conditions such as heart disease, lung disease, and diabetes, and people over the age 60, are at a higher risk of becoming infected and more likely to become seriously ill. Safety measures such as social distancing, vaccines, respiratory etiquette, and the wearing of face masks or cloth face coverings are our first line of defense to keep people safe from severe illness. [44]

**Note:** In this document, the term "face mask" will be used for both face masks and cloth face coverings.



Wearing a face mask is one important way to slow the spread of COVID-19. [45]

On July 27, 2021, the Centers for Disease Control and Prevention (CDC) updated its guidance on face masks. The CDC recommends that face masks be worn by everyone, regardless of vaccination status, in areas of substantial and high transmission. Wearing a face mask increases protection from the Delta variant and lessens the chance of spreading it to others. [1][43] The CDC considers substantial transmission to be 50 to 100 new cases per 100,000 people over a seven-day period. High transmission is 100 or more cases per 100,000 people over seven days or in areas with 8% or higher positive test rates. [32]

Additionally, the CDC urges that fully vaccinated people who have compromised immune systems continue to wear a face mask. The number of federal, state and U.S. territories with face mask mandates changes in response to current outbreak conditions. [33]

🇺🇸 English

Wearing a face mask may be difficult for some people with a disability. State and local government agencies or private businesses that want customers to use a face mask may have questions and concerns. This fact sheet offers guidance to questions about the issue of face mask policies, reasons why a person with a disability might not be able to wear a face mask, and the legal rights a person has under the Americans with Disabilities Act (ADA).

**May a federal, state or local government agency or a business require customers to wear a face mask?**

**NOTE: CDC Guidance**

The information from the Centers for Disease Control and Prevention (CDC) and other authorities has changed as the COVID-19 pandemic evolves and new variants emerge. Therefore, private businesses and government agencies should follow the most current information on maintaining safety by reviewing the [CDC Coronavirus (COVID-19) information](#) (cdc.gov).

You can also access more information at:
• [Accessible COVID-19 Resources from CDC guidance](#)
Source: Center for Inclusive Design and Innovation (CIDI)
• [Older Adults and People with Disabilities: COVID-19 Resources](#)
Source: Administration for Community Living (ACL)

**UPDATES**
**August 27, 2021 – State Mask Mandates**

The number of federal, state and U.S. territories with face mask mandates changes in response to current outbreak conditions. As of August 27, 2021, ten states (California, Connecticut, Hawaii, Illinois, Louisiana, Nevada, New Mexico, New York, Oregon and Washington), the District of Columbia, and the territory of Puerto Rico have mask mandates in place. Also, on August 27, Oregon became the first state to reimpose a face-covering requirement for people in outdoor public settings, and Illinois' indoor mask order is being expanded to cover vaccinated people, effective August 30.[33]

**August 20, 2021 – Face Masks, Travel and Transportation**

The Centers for Disease Control and Prevention (CDC), Transportation Security Administration (TSA), and the U.S. Department of Transportation (DOT) remind people who chose to travel that they are still required to wear a face mask

🇺🇸 English

buses, trains, and other forms of public transportation traveling into, within, or outside of the United States. This includes all U.S. transportation hubs such as airports and stations for trains and buses. CDC guidance states that fully vaccinated people are safe to travel and can resume travel within the United States.[46] However, travel outside the United States poses additional risks. Fully vaccinated travelers might be at increased risk for getting and possibly spreading some COVID-19 variants.[47]

On Friday, August 20, 2021, the Transportation Security Administration (TSA) is extending the face mask requirement for individuals across all transportation networks throughout the United States, through January 18, 2022. The transportation network includes airports, onboard commercial aircraft, on over-the-road buses, and on commuter bus and rail systems.[48]

**July 27, 2021 – Centers for Disease Control (CDC)**
**Interim Public Health Recommendations for Fully Vaccinated People**

On July 27, 2021, the Centers for Disease Control and Prevention (CDC) updated its guidance on face masks for fully vaccinated people. The CDC recommends that face masks be worn by everyone, regardless of vaccination status.[1] The guidance specifically states that a fully vaccinated person should "wear a mask indoors in public if you are in an area of substantial or high transmission."[32]

CDC continues to urge people with compromised immune systems and people who live in households with people who have compromised immune systems to wear masks. The CDC recommends that fully vaccinated people who have a known exposure to someone with suspected or confirmed COVID-19 infection be tested 3-5 days after exposure and to wear face masks in indoor public settings for 14 days or until they receive a negative test result.Finally, the CDC recommends that all teachers, staff, students, and school visitors wear masks in school settings, regardless of vaccination status.[42]

**July 19, 2021 – American Academy of Pediatrics (AAP)**
**COVID-19 Guidance for Safe Schools**

On July 19, 2021, the American Academy of Pediatrics (AAP), the leading pediatrics organization in the United States, issued a face mask recommendation for schools that are re-opening this fall. The AAP advises that all staff and students over the age of 2 wear face masks when at school unless prohibited by a medical or developmental condition. The AAP guidance also strongly encourages all eligible

individuals to receive the COVID-19 vaccine. Schools are urged to provide available and accessible vaccine resources for the whole community.

AAP endorsed the guidance from the Centers for Disease Control (CDC) that schools carry out multiple prevention strategies including social distancing, face masks, handwashing, quarantining, cleaning, disinfections, screening testing, building ventilation, and respiratory etiquette. These things help limit the transmission of respiratory pathogens that are airborne or spread by droplets. [39]

**Respiratory Etiquette**

- Covering your mouth and nose when coughing or sneezing.
- Using tissues and throwing them away.
- Washing your hands or using hand sanitizer every time you touch your mouth or nose.
- Providing tissues and no-touch trash cans to throw them away
- Offering disposable face masks to customers and employees

The AAP, citing guidance from the World Health Organization (WHO), the United Nations Children's Fund (UNICEF), and the CDC, urges schools to be opened this fall. They state that there is no evidence of significantly increased community transmission by opening schools. The AAP also believes that "remote learning exposed inequities in education, was detrimental to the educational attainment of all students, and exacerbated a mental health crisis among children and adolescents". [40]

**July 9, 2021 – Centers for Disease Control and Prevention (CDC) Guidance for COVID-19 Prevention in K-12 Schools**

On July 9, 2021, the Centers for Disease Control and Prevention (CDC) provided guidance that individuals who are not fully vaccinated (age 2 and older) should continue to wear face masks indoors and in crowded settings when physical distancing cannot be maintained.  It is recommended that **schools** maintain 3 feet of physical distancing in classrooms. **Schools** should also carry out multiple strategies to prevent the spread of COVID-19. These strategies include: social distancing, face masks, handwashing, screening testing, ventilation, and respiratory etiquette.  The CDC emphasized the importance of in-person instruction even when a school cannot implement all prevention strategies. [38]

**June 10, 2021 – Face Masks, Travel and Transportation – Outdoor Areas**


🇺🇸 English

The Centers for Disease Control and Prevention (CDC) issued guidance that face masks are no longer required in **outdoor areas** where transportation is provided or at transportation hubs. Transportation includes: airplanes, trains, school buses, subways, buses, taxis, ride-shares, trolleys, cable cars, and ships and boats. Transportation hub is any location where people await, board, or disembark from public transportation. In these cases, private vehicles are not considered transportation.

If transportation sites or transportation hubs have **outdoor areas** (such as on a ferry or an open-air trolley or bus), wearing a face mask is not required while outdoors **unless otherwise required** by the operator, federal, State, tribal, territorial, or local government. However, the CDC continues to recommend wearing of face masks in these areas by people who are not fully vaccinated to protect themselves and others.[37]



**February 1, 2021 – Face Masks, Travel and Transportation**

A **federal order took effect requiring travelers to wear face masks**. According to the order from the Centers for Disease Control and Prevention (CDC), face masks must be worn by passengers on trains, buses, trains and subways, airplanes, ships, taxis and ride-share services as well as any other mode of transportation. The order also requires face masks at all transportation hubs including airports, bus terminals, seaports, train stations, and U.S. ports of entry.[30] This guidance follows President Biden's executive order requiring face masks to be worn on all federal properties. [31]

**March 11, 2020: Centers for Disease Control and Prevention (CDC) Face Mask Recommendation**

🇺🇸 English

The **World Health Organization (WHO) declared COVID-19 as a pandemic**.[2] The Centers for Disease Control and Prevention (CDC) noted that studies have shown that many people who do not have symptoms of COVID-19 can spread the virus to other people. Because it takes four to fourteen days for someone to show symptoms, they also may infect others without knowing it.[3] This means that the virus can be shared between people who are close to each other. For example, people who are speaking, coughing, or sneezing may spread the virus even if they do not have symptoms.
[4] Therefore, the CDC recommends that people over age two wear a face mask in public or where it can be hard to stay six feet apart from others.[5]

**Court Cases: ADA and Face Masks**
**Resurrection School v. Hertel**

In a ruling handed down on August 23, 2021, the Sixth Circuit Court of Appeals, upheld a district court ruling that refused to block a mask mandate put in place by the Michigan Department of Health and Human Services. Resurrection Catholic Elementary School sued Elizabeth Hertel, the Director of the Michigan Department of Health and Human Services, claiming the face mask mandate was a violation of their rights to free exercise of religion, equal protection, and due process, because face masks hide faces "made in God's image and likeness." Although the mask mandate in Michigan was lifted before this decision, the Sixth Circuit's decision is important in the event a new mask mandate is imposed. The court relied on a rational basis test, saying the state has a legitimate interest to keep the public safe and that the mandate applied to all elementary schools and did not single out religious education institutions.[49]

**Pletcher v. Giant Eagle Inc.**

In another case decided on October 23, 2020, in the Federal District Court for the Western District of Pennsylvania, the Court denied a preliminary injunction in the case of Pletcher v. Giant Eagle Inc. If granted, the injunction would have required Giant Eagle Inc. to change its policy of requiring all customers to wear a face mask or other face covering inside their store. In this case, sixty-nine plaintiffs filed a class action suit claiming Giant Eagle Groceries were in violation of Title III of the ADA by denying access to customers who claimed they could not wear a face mask due to their disabilities. In the ruling, U.S. District Judge Nora Barry Fischer determined that the store's face mask policy was a correct interpretation of the Pennsylvania Department of Health's order that face masks are to be worn in public spaces and that those who cannot wear a face mask may instead wear a face shield. Giant Eagle noted

defense that they had in place other modifications to policy and practice consistent with ADA Title III to accommodate customers with disabilities.[29]

**Bunn v. Nike, Inc.**

In July 2020, Bunn v. Nike Inc., San Francisco Superior Court, resulted in a class action settlement for customers who are deaf or hard of hearing. The suit claimed that Nike's policy requiring all retail employees to wear face masks violated the ADA. In the settlement, Nike agreed to make the following changes to address the issues for customers who are deaf or hard of hearing: (1) reasonable modifications to policy, practice, and procedure by requiring employees to wear transparent face masks to provide effective communication; (2) providing guidance to employees about accommodating customers; and (3) posting signs at store entrances notifying customers they can request additional assistance.[41]

**Is there a reason a person might not be able to wear a face mask?**

The Centers for Disease Control and Prevention (CDC) states that a person who has trouble breathing, is unconscious, incapacitated, or otherwise unable to remove the face mask without assistance should not wear a face mask or cloth face covering.[6]

**Examples of a person with a disability who might not be able to wear a face mask**

- Individuals with asthma, chronic obstructive pulmonary disease (COPD), or other respiratory disabilities may not be able to wear a face mask because of difficult or impaired breathing. People with respiratory disabilities should consult their own medical professional for advice about using face masks. The Centers for Disease Control and Prevention (CDC) also states that anyone who has trouble breathing should not wear a face mask.[7]



- People with post-traumatic stress disorder (PTSD), claustrophobia (an abnormal fear of being in enclosed or narrow places), severe anxiety[8] may feel afraid or terrified when wearing a face mask. These individuals may not be able to stay calm or function when wearing a face mask.

🇺🇸 English

- Some people with autism are sensitive to touch and texture.[9] Covering the nose and mouth with fabric can cause sensory overload, feelings of panic, and extreme anxiety.
- A person who has cerebral palsy may have difficulty moving the small muscles in the hands, wrists, or fingers. Due to their limited mobility,  they may not be able to tie the strings or put the elastic loops of a face mask over the ears. This means that the person may not be able to put on or remove a face mask without assistance.
- A person who uses mouth control devices such as a sip and puff to operate a wheelchair or assistive technology or uses their mouth or tongue to use assistive ventilators may be unable to wear a face mask.

**If a person with a disability is unable to wear a face mask, do I still have to allow them in my business or government agency?**

The number of federal, state and U.S. territories with face mask mandates changes in response to current outbreak conditions.[33] As of July 20, 2021, eight states (California, Connecticut, Hawaii, Illinois, Nevada, New Mexico, New York, and Washington), the District of Columbia, and the territory of Puerto Rico have mask mandates in place.

These mandates vary by state. For the most part, the mandates require face masks to be worn by people who are unvaccinated and not fully vaccinated inside public spaces, public transportation, workplaces, congregate settings and any situation that where six feet of social separation cannot occur. These mandates also include exemptions for children, people with disabilities or medical conditions, and situations where face masks interfere with effective communication.[26] These state mandates do not override the consideration of reasonable modifications to policy, practice, and procedure required by the Americans with Disabilities Act (ADA). Many private businesses have also developed policies requiring the use of face masks. The ADA does not have any rules that address the required use of face masks by state and

local governments or private business owners.

🇺🇸 English

If a person with a disability is not able to wear a face mask, state and local government agencies and private businesses must consider **reasonable modifications** to a face mask policy so that the person with the disability can participate in, or benefit from, the programs offered or goods and services that are provided. A reasonable modification means changing policies, practices, and procedures, if needed, to provide goods, services, facilities, privileges, advantages, or accommodations to an individual with a disability.[10] It is important to focus on how to provide goods or services to a customer with a disability in an equal manner. This can be done by reasonably modifying your policies, practices, or procedures.

The requirement to modify a policy, practice, or procedure **does not include individuals** *without* **disabilities**, as they are not protected under the Americans with Disabilities Act (ADA).

**Examples of reasonable modifications to a face mask policy**

- Allow a person to wear a scarf, loose face covering, or full face shield instead of a face mask.
- Allow customers to order online with curbside pick-up or no contact delivery in a timely manner.
- Allow customers to order by phone with curb-side pick-up or no contact delivery in a timely manner.
- Allow a person to wait in a car for an appointment and enter the building when called or texted.
- Offer appointments by telephone or video calls.

**Are there any situations when an agency or business does not have to provide a reasonable modification to the face mask policy?**

There are three reasons under the Americans with Disabilities Act (ADA) that a state or local government agency or private business may not have to provide a reasonable modification.

🇺🇸 English

## Fundamental Alteration

A state or local government agency or private business may not have to provide a reasonable modification if the modification would change the nature of the service, program, activity, goods, services, or facilities.[11][12]

A fundamental alteration is a change to such a degree that the original program, service, or activity is no longer the same.[13]

- **Example of a fundamental alternation**: A customer requests that a store deliver her items to her home as a reasonable modification so that she does not have to enter the store. The store does not offer a home delivery. Therefore, the store would not have to grant the request for home delivery since it would be a fundamental alteration of their services.

## Undue Burden

A state and local government agency or private business is not required to take any action that it can demonstrate would result in an undue financial or administrative burden. An undue burden is a significant difficulty or expense.[14][15]

- **Example of an undue burden**: A person would like to visit city library when no other customers are present. He requests that staff allow him in 30 minutes before the building opens. This might be an undue burden for the library due to limited staffing.

The requirements for showing an undue financial or administrative burden are different for a state or local government agency and a private business.

## State or Local Government Agency and Undue Burden

The head of a state or local government agency or his/her designee are the only ones who can make the decision as to whether a reasonable modification is an undue burden. The decision-maker must provide information in writing with the reasons why the modification is an undue burden.

In determining whether financial and administrative burdens are excessive, all financial resources used to fund the programs, services, or activities of the public entity must be considered. If an action would result in an undue burden, the

English

local government agency must look for other ways to ensure that individuals with disabilities receive the benefits and services of the program or activity.[27]

**Private Business and Undue Burden**

A private business must consider the following things to determine if an action or reasonable modification would result in an undue burden.

1. The nature and cost of the reasonable modification.
2. The overall financial resources of the business making the reasonable modifications; the number of people employed at the business; the effect on expenses and resources of the business; legitimate safety requirements that are necessary for safe operation, including crime prevention measures; or the impact otherwise of the action upon the operation of the site.
3. For businesses with multiple sites, consideration is given to the degree of geographic separateness and the administrative or financial relationship of the sites that will make the modification more difficult or expensive.
4. If applicable, the overall financial resources, size, number of employees, and type and location of facilities of the parent corporation or entity (if the business involved in the reasonable modification is part of a larger business).
5. If applicable, an assessment is made of the parent corporation or entity's type of operation, including the structure and functions of the workforce.[28]

**Direct Threat**

A state or local government agency or private business may not have to provide a reasonable modification to the face mask policy if the individual with a disability poses a direct threat to the health or safety of others.

A direct threat is a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services.[16][17] The determination that a person poses a direct threat to the health or safety of others may not be based on generalizations or stereotypes about the effects of a particular disability. It must be based on an individual assessment that considers the particular activity and the actual abilities

🇺🇸 English

and disabilities of the individual.[18][19]

During a pandemic, state and local government agencies and businesses should use the most up to date information from the Centers for Disease Control and Prevention (CDC), the U.S. Department of Labor (DOL) Occupational Safety and Health Administration (OSHA), and the state public health agencies. Because the pandemic threat to health and safety will vary by region, you should consult your local public health agency for guidance.[20]

To limit a direct threat from the COVID-19 pandemic, a state or local government agency or private business may impose legitimate safety requirements necessary for safe operation. However, these groups must ensure that their safety requirements are based on real, specific risks, not on speculation, stereotypes, or generalizations about individuals with disabilities.[21][22] These safety requirements must be consistent with the ADA regulations about direct threat and legitimate safety requirements, and consistent with advice from the CDC and public health authorities.

To limit a direct threat and have safety requirements in place to address the COVID-19 pandemic, state and local government agencies and businesses may:

- Develop policies and procedures for prompt identification and isolation of people with symptoms of COVID-19, including employees and customers.
- Offer face masks to employees and customers.
- Enforce social distancing guidelines.
- Inform customers about symptoms of COVID-19 and ask sick customers to minimize contact with workers and other customers until they are healthy again.
- Post signs with COVID-19 information in places that sick customers may visit (e.g., pharmacies, hospitals, public health agencies, grocery stores).
- Include COVID-19 information in automated messages sent when messages are sent to customers via phone messages, text, or email; and/or
- Limit customers in-person access by customers to the buildings operated by a state or local government agency or private business, as appropriate.

🇺🇸 English

**How should I respond to a request for a reasonable modification to the face mask policy?**

The U.S. Department of Justice (DOJ) issued two settlement agreements that provide guidance on the reasonable modification decision-making process.[23][24]

1. A state or government agency should designate at least one person, and a back-up, who are authorized to receive and review requests for reasonable modifications. The decision-maker for a state or local government agency is the head of the public agency or their designee.[25] Although not required, private businesses are encouraged to designate a person to receive and review requests for reasonable modifications and make decisions.

2. After receiving a request for a reasonable modification, talk with the individual with a disability to learn why the person needs to modify the face mask policy and to find a solution that meets ADA requirements. Decisions about reasonable modifications should be made in a timely manner.

3. After the discussion, the government agency or private business may:

   1. Agree to the request. In most cases, because the interaction is brief, businesses such as department stores, grocery stores, and pharmacies or government agencies such as the courthouse or drivers' services, will be able to agree to the request. Generally, state and local governments may not ask for documentation of disability as the interactions are brief and in doing so would amount to unequal treatment of people with disabilities.

   2. Deny the request. If a request for modifications is denied, a state or local government agency or private business is encouraged to provide a written statement as to why the request was denied, provide a copy to the person with a disability, and keep a copy on file.

   3. In some unique circumstances where the interaction is not brief (e.g., a college or university that offers students extended residency in dormitories), the school may ask students with non-obvious disabilities for medical documentation about the person's disability that is narrowly tailored and is absolutely necessary to:

      1. Verify that the individual meets the ADA definition of disability (i.e., has a physical or mental impairment that substantially limits one or more major life activities); or

      2. Describe the needed modification; or

      3. Show the relationship between the individual's disability and the need for the requested modification.

🇺🇸 English

**Medical Documentation**

The U.S. Department of Justice (DOJ) nor other federal agencies with enforcement authority have not provided specific guidance about whether a store can or cannot ask for medical documentation about a person's inability to wear a face mask due to a disability. Generally, guidance from the U.S. Department of Justice has not allowed asking for documentation for accommodations at businesses where interactions are brief, such as grocery stores or pharmacies. Some places such as medical offices or hospitals may need the medical documentation because a person who is not wearing a face mask may infect other people who are sick.

**Best Practice Tip**

Prepare a list of possible alternatives to a face mask/cloth face covering policy that you can share with people with disabilities who request a reasonable modification to your policy. See: [Examples of reasonable modifications to a face mask policy](#) for examples of policy modifications.

**Summary**

As the COVID-19 pandemic continues, state and local government agencies and private businesses must make reasonable modifications to allow people with disabilities to access the goods and services they offer. Following ADA requirements for reasonable modifications within federal, state, and local health and safety guidelines will allow you to keep employees and customers safe, reduce new infections, and still provide goods and services to everyone.

**Resources**

For more about your rights under the Americans with Disabilities Act (ADA) and how they apply to the coronavirus (COVID-19) pandemic: [ADA, Disability & COVID-19 Resources](#) (adacovid19.org)

For additional information on face coverings and the ADA:

- **Fact Sheet:** [Healthcare & Face Coverings: Reducing Communication Barriers for Deaf and Hard of Hearing Patients](#)
  Source: ADA National Network, Northwest ADA Center (adata.org)
- **Fact Sheet:** [Face Coverings and Businesses: Balancing the ADA with Public Health During COVID-19](#)

🇺🇸 English

Source: Northwest ADA Center (nwadacenter.org)
- **FAQs:** The ADA, Small Business and Face Masks
  Source: Great Plains ADA Center (gpadacenter.org)
- **ADA Today Podcast**: COVID-19, Face Mask Policies and ADA Title II and III
  Source: Mid-Atlantic ADA Center (adainfo.org)
- **Webinar Archive:** Face Coverings and the ADA – Application of ADA Title III
  Source: ADA Audio Webinar Series: Great Lakes ADA Center
  (accessibilityonline.org)

**ADA National Network**

For questions and training on the Americans with Disabilities Act (ADA),
contact your regional ADA center at **1-800-949-4232**
or visit the national website: adata.org
— All calls are confidential. **We do not give medical or legal advice.** [Refer
to: Disclaimer]

**Citation**

Williamson, P. R., Morder, M. J., & Whaley, B. A. (2020). *The ADA and Face Mask
Policies* [Fact sheet]. Up to Date August 27, 2021. Retrieved
from https://www.adasoutheast.org/disability-issues/ada-and-face-mask-
policies.php

**Endnotes**

[1] Centers for Disease Control and Prevention (CDC). (2021, July 27). When you've
been fully vaccinated – how to protect yourself and others. Retrieved July 28, 2021,
from https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html

[2] World Health Organization (WHO). (2020, April 27). WHO Timeline – COVID-19.
Retrieved June 1, 2020, from https://www.who.int/news-room/detail/27-04-2020-
who-timeline—covid-19

[3] Centers for Disease Control and Prevention (CDC). (2020, May 12). Clinical
Questions about COVID-19: Questions and Answers. Retrieved June 4, 2020, from
https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Transmission

[4] Centers for Disease Control and Prevention (CDC). (2021, August 13). Your Guide
to Masks. Retrieved August 13, 2021, from https://www.cdc.gov/coronaviru


🇺🇸 English

ncov/prevent-getting-sick/about-face-coverings.html

[5] Centers for Disease Control and Prevention (CDC). (2020, May 22). **About Cloth Face Coverings**. Retrieved June 2, 2020, from https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/about-face-coverings.html

[6] Centers for Disease Control and Prevention (CDC). (2020, May 22). **About Cloth Face Coverings**. Retrieved June 2, 2020, from https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/about-face-coverings.html

[7] Centers for Disease Control and Prevention (CDC). (2020, May 22). **About Cloth Face Coverings**. Retrieved June 2, 2020, from https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/about-face-coverings.html

[8] **Definition of claustrophobia**. (n.d.). Retrieved May 29, 2020, from https://www.dictionary.com/browse/claustrophobia?s=t

[9] Des Roches Rosa, S. (2020, May 11). **Some autistic people can't tolerate cloth face coverings. Here's how we're managing with our son** *The Washington Post*. Retrieved from https://www.washingtonpost.com/lifestyle/2020/05/11/some-autistic-people-cant-tolerate-face-masks-heres-how-were-managing-with-our-son/

[10] ADA National Network. (n.d.) **Health Care and the Americans with Disabilities Act**. Retrieved May 29, 2020, from https://adata.org/factsheet/health-care-and-ada

[11] U.S. Department of Justice (DOJ). (2010). **Americans with Disabilities Act Title II regulations: nondiscrimination on the basis of disability in state and local government services**. Retrieved from https://www.ada.gov/regs2010/titleII_2010/titleII_2010_regulations.htm

[12] U.S. Department of Justice (DOJ). (2017). **Americans with Disabilities Act Title III Regulations: nondiscrimination on the basis of disability in public accommodations and commercial facilities**. Retrieved from https://www.ada.gov/regs2010/titleII_2010/titleII_2010_regulations.htm

[13] U.S. Department of Justice (DOJ). (2008, October 9). **ADA Best Practices Tool Kit for State and Local Governments – Chapter 1 ADA Basics: Statute and Re**

🇺🇸 English

Retrieved June 3, 2020, from https://www.ada.gov/pcatoolkit/chap1toolkit.htm

[14] U.S. Department of Justice (DOJ). (2010). Americans with Disabilities Act Title II regulations: nondiscrimination on the basis of disability in state and local government services. Retrieved from https://www.ada.gov/regs2010/titleII_2010/titleII_2010_regulations.htm

[15] U.S. Department of Justice (DOJ). (2017). Americans with Disabilities Act Title III Regulations: nondiscrimination on the basis of disability in public accommodations and commercial facilities. Retrieved from https://www.ada.gov/regs2010/titleIII_2010/titleIII_2010_regulations.htm

[16] U.S. Department of Justice (DOJ). (2010). Americans with Disabilities Act Title II regulations: nondiscrimination on the basis of disability in state and local government services. Retrieved from https://www.ada.gov/regs2010/titleII_2010/titleII_2010_regulations.htm

[17] U.S. Department of Justice (DOJ). (2010). Americans with Disabilities Act Title III Regulations: nondiscrimination on the basis of disability in public accommodations and commercial facilities. Retrieved from https://www.ada.gov/regs2010/titleIII_2010/titleIII_2010_regulations.htm

[18] U.S. Department of Justice (DOJ). (1993, November). The Americans with Disabilities Act Title II Technical Assistance Manual Covering State and Local Government Programs and Services. Retrieved June 2, 2020, from https://www.ada.gov/taman2.html

[19] U.S. Department of Justice (DOJ). (1993). Americans with Disabilities Act Title III Technical Assistance Manual – Covering Public Accommodations and Commercial Facilities. Retrieved June 3, 2020, from https://www.ada.gov/taman3.html

[20] U.S. Equal Employment Opportunity Commission (EEOC). (2020, March 21). Pandemic Preparedness in the Workplace and the Americans with Disabilities Act. Retrieved June 5, 2020, from https://www.eeoc.gov/laws/guidance/pandemic-preparedness-workplace-and-americans-disabilities-act

[21] U.S. Department of Justice (DOJ). (2010). Americans with Disabilities Act Title II regulations: nondiscrimination on the basis of disability in state and local government services. Retrieved from https://www.ada.gov/regs2010/titleII_2010/titleII_2010_regulations.htm

 English

[22] U.S. Department of Justice (DOJ). (2017). Americans with Disabilities Act Title III Regulations: nondiscrimination on the basis of disability in public accommodations and commercial facilities. Retrieved from https://www.ada.gov/regs2010/titleIII_2010/titleIII_2010_regulations.htm

[23] U.S. Department of Justice (DOJ). (2016, July 28). Settlement Agreement Between the United States of America and YMCA of the Triangle under the Americans with Disabilities Act (DJ # 202-54-148). Retrieved June 3, 2020, from https://www.ada.gov/ymca_triangle_sa.html

[24] U.S. Department of Justice (DOJ). (2010, November 22). Settlement Agreement Between the United States of America and the District of Columbia under the Americans with Disabilities Act. Retrieved June 3, 2020, from https://www.ada.gov/dc_shelter.htm

[25] U.S. Department of Justice (DOJ). (n.d.). Common Questions about Title II of the Americans with Disabilities Act [Text file]. Retrieved June 3, 2020, from https://www.ada.gov/pubs/t2qa.txt

[26] Markowitz, A. (2020, July 30). Does Your State Have a Mask Mandate Due to Coronavirus?. Retrieved July 30, 2020, from https://www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-coronavirus.html

[27] U.S. Department of Justice (DOJ). (1992). The Americans with Disabilities Act Title II Technical Assistance Manual. Retrieved August 18, 2020, from https://www.ada.gov/taman2.html

[28] U.S. Department of Justice (DOJ). (2017). Americans with Disabilities Act Title III Regulations § 36.104 Definitions. Retrieved August 18, 2020, from https://www.ada.gov/regs2010/titleIII_2010/titleIII_2010_regulations.htm#a104

[29] U.S. District Court for the Western District of Pennsylvania. (2020, October 23). Pletcher v. Giant Eagle Inc., Civil Action No. 2:20-754 (W.D. Pa. Oct. 23, 2020). Retrieved from https://casetext.com/case/pletcher-v-giant-eagle-inc

[30] Centers for Disease Control and Prevention (CDC). (2021, January 29). Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs [PDF, 11 pages], Order under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2, 71.31(b),

🇺🇸 English

71.32(b). Retrieved January 30, 2021 from
https://www.cdc.gov/quarantine/pdf/Mask-Order-CDC_GMTF_01-29-21-p.pdf

[31] The White House. (2021, January 20). **Executive Order on Protecting the Federal Workforce and Requiring Mask-Wearing**. Retrieved January 21, 2021 from https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-protecting-the-federal-workforce-and-requiring-mask-wearing/

[32] Centers for Disease Control and Prevention (CDC). (n.d.). **CDC COVID Data Tracker**. Retrieved July 28, 2021 from https://covid.cdc.gov/covid-data-tracker/#county-view

[33] American Association of Retired Persons (AARP). (2021, August 27). **State-by-State Guide to Face Mask Requirements**. Retrieved August 27, 2021 from https://www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-coronavirus.html

[34] Transportation Security Administration (TSA). (2021, April 30). **TSA extends face mask requirement at airports and throughout the transportation network**. Retrieved April 03, 2021 from https://www.tsa.gov/news/press/releases/2021/04/30/tsa-extends-face-mask-requirement-airports-and-throughout

[35] Centers for Disease Control and Prevention (CDC). (2021, May 13). **When You've Been Fully Vaccinated: How to Protect Yourself and Others**. Retrieved May 13, 2021 from https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html

[36] Transportation Security Administration (TSA). (2021, May 14). **Joint Statement: Mask Mandate On Public Transportation Remains in Effect**. Retrieved May 14, 2021 from https://www.tsa.gov/news/press/statements/2021/05/14/joint-statement-mask-mandate-public-transportation-remains-effect

[37] Centers for Disease Control and Prevention (CDC). (2021, June 10). **Requirement for Face Masks on Public Transportation Conveyances and at Transportation Hubs**. Retrieved June 10, 2021 from https://www.cdc.gov/coronavirus/2019-ncov/travelers/face-masks-public-transportation.html

[38] Centers for Disease Control and Prevention (CDC). (2021, July 9). **Guidance for COVID-19 Prevention in K-12 Schools**. Retrieved July 9, 2021 from

🇺🇸 English

https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html

[39] Centers for Disease Control and Prevention (CDC). (2021, July 9). Prevention strategies and school in-person learning – Science Brief: Transmission of SARS-CoV-2 in K-12 Schools and Early Care and Education Programs – Updated. Retrieved July 19, 2021 from https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/transmission_k_12_schools.html#in-person

[40] American Academy of Pediatrics (AAP). (2021, July 19). AAP COVID-19 Guidance for Safe Schools.. Retrieved July 19, 2021 from https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/covid-19-planning-considerations-return-to-in-person-education-in-schools/

[41] Superior Court of the State of California, County of San Francisco. (2020, July 29). Bunn v. Nike Inc. [PDF, 13 pages], CGC20585683. Retrieved July 19, 2021 from https://www.classaction.org/media/bunn-v-nike-inc.pdf

[42] Centers for Disease Control and Prevention. (2021, July 27). Interim public health recommendations for fully vaccinated people. Retrieved July 28, 2021 from https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html

[43] Centers for Disease Control and Prevention. (2021, July 27). Delta Variant: What We Know About the Science. Retrieved August 12, 2021 from https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.htmll

[44] Centers for Disease Control and Prevention. (2021, August 4). Families with Vaccinated and Unvaccinated Members. Retrieved August 12, 2021 from https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19/caring-for-children/families.html

[45] Centers for Disease Control and Prevention. (2021, July 14). CDC calls on Americans to wear masks to prevent COVID-19 spread. Retrieved August 12, 2021 from https://www.cdc.gov/media/releases/2020/p0714-americans-to-wear-masks.html

[46] Centers for Disease Control and Prevention. (2021, August 20). Domestic Travel During COVID-19 . Retrieved August 20, 2021 from

🇺🇸 English

https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html).

[47] Centers for Disease Control and Prevention. (2021, August 20). International Travel During COVID-19 . Retrieved August 20, 2021 from https://www.cdc.gov/coronavirus/2019-ncov/travelers/international-travel-during-covid19.html

[48] Transportation Security Administration (TSA). (2021, August 20). TSA extends face mask requirement through January 18, 2022 . Retrieved August 20, 2021 from https://www.tsa.gov/news/press/releases/2021/08/20/tsa-extends-face-mask-requirement-through-january-18-2022

[49] Justia U.S. Case Law Federal Courts of Appeals Sixth Circuit 2021. (2021, August 23). Resurrection School v. Hertel, No. 20-2256 (6th Cir. 2021). Retrieved August 27, 2021 from https://law.justia.com/cases/federal/appellate-courts/ca6/20-2256/20-2256-2021-08-23.html

**Disclaimer:**

**These materials do not constitute legal advice and should not be relied upon in any individual case. Please consult an attorney licensed in your state for legal advice and/or representation.** These materials were prepared by the legal research staff of the Burton Blatt Institute (BBI) at Syracuse University in partnership with the Southeast ADA Center to highlight legal and policy developments relevant to civil rights protections and the impact of court decisions in the Southeast Region under the Americans with Disabilities Act (ADA). These materials are based on federal disability rights laws and court decisions in effect at the time of publication. Federal and state disability rights law can change at any time.  In addition, state and local laws and regulations may provide different or additional protections. Materials are intended solely as informal guidance, and are neither a determination of your legal rights nor responsibilities under the ADA or other federal, state, and local laws, nor binding on any agency with enforcement responsibility under the ADA. The accuracy of any information contained herein is not warranted. Any links to external websites are provided as a courtesy and are not intended to nor do they constitute an endorsement of the linked materials.

🇺🇸 English

Contact · Terms of Use · Disclaimer · Accessibility

Funded by **NIDILRR** Grant #90DPAD0005-01-00.

©2021, Syracuse University. All rights reserved.

**Period WordPress Theme** by Compete Themes.

🇺🇸 English

Name: Aaron Abadi | DOB: ████████  MRN: 9141633 | PCP: Yelena Karasina, MD

# Letter Details                                    EXHIBIT  B



**Yelena Karasina, MD**
**NYU LANGONE AMBULATORY CARE WEST SIDE**
355 WEST 52ND ST
NEW YORK NY 10019-6239
Phone: 646-754-2100
Fax: 646-754-2148

December 3, 2020

Patient: **Mr. Aaron Abadi**
Date of Birth: ████████
Date of Visit: **12/3/2020**

To Whom it May Concern:

Mr. Aaron Abadi is suffering from extreme sensitivity to touch,mostly in the area of his head.For this reason he is unable to wear face mask or face shield,and should not be required to do so.
He has already recovered from COVID,and is not contagious.

Sincerely,

Yelena Karasina, MD

*This letter was initially viewed by Aaron Abadi at 12/7/2020 9:41 AM.*

MyChart® licensed from Epic Systems Corporation © 1999 - 2021

EXHIBIT  C

# AFTER VISIT SUMMARY



**Aaron Abadi**  DoB: ▮▮▮▮▮▮  📅 5/6/2021  3:30 PM  📍 Preston Robert Tisch Center for Men's Health 646-754-2000

---

## Instructions  from Ian Lustbader, MD



### Today's medication changes

➡️ START taking:

▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮

Accurate as of May 6, 2021  9:17 PM.
**Review your updated medication list below.**

---

🛒 **Pick up these medications at CVS/pharmacy #2716 Cor of Nassau 129 Fulton St, New York, NY 10038-2716 212-233-5021 212-233-7153**

▮▮▮▮▮▮▮▮

Your estimated payment per fill: **$0**

Address:   129 Fulton St, New York NY 10038-2716
Phone:      212-233-5021

---

🧪 **Labs ordered today**
URINALYSIS (NO CULTURE) WITH REFLEX TO MICROSCOPY
Please complete by 5/6/2021

---

📅 **Return in about 6 months**
(around 11/6/2021) for repeat labs, review meds, renew meds, follow up symptoms.

---

# Today's Visit



You saw Ian Lustbader, MD on Thursday May 6, 2021 for:

- ████████████████
- ████████████
- ███████████████

The following issues were addressed:

- ████████████████████████
- ███████████████████
- ████████████████
- ██████████████
- Sensory integration disorder
- ███████████████
- ██████████████

| Blood Pressure | BMI | Weight | Height |
|---|---|---|---|
| 158/93 | 28.05 | 211 lb 10.3 oz | 6' 0.84" |

| Temperature (Oral) | Pulse | Oxygen Saturation | |
|---|---|---|---|
| 98.3 °F | 89 | 98% | |

## ✚ Done Today

████████████████
████████
████████
██████████
████████████████
██████████
███████████████████
███████████████████

## ⊘ Immunizations Given

██████████

# What's Next

**JUL 28 2021**

### New Patient Appointment with John G Zampella, MD
Wednesday July 28 1:30 PM
Please arrive 15 minutes prior to your appointment time.
Bring your insurance card and photo identification.
Bring your MD referral/pre-certification (if applicable).
Bring a copy of your medical records, recent test results (including labs, X-ray, CT, etc,) that relate to the reason for your visit.
Bring the name and phone number of your primary and referring MD.
Be prepared to pay any co-payments or patient responsible balances at the time of your appointment.

Preston Robert Tisch Center for Men's Health
555 Madison Ave
New York NY 10022-3301
646-754-2000

SEP
**1**
2021

**Physical with Yelena Karasina, MD**
Wednesday September 1 11:00 AM
Arrive 15 minutes prior to appointment.

NYU Langone Ambulatory Care West
Side
355 West 52nd St
New York NY 10019-6239
646-754-2100

OCT
**27**
2021

**Follow Up Appointment with Ian Lustbader, MD**
Wednesday October 27 4:30 PM
Arrive 15 minutes prior to appointment.

Preston Robert Tisch Center for Men's
Health
555 Madison Ave
New York NY 10022-3301
646-754-2000

## NYU Langone Health App & MyChart

- Download the NYU Langone Health app on the **App Store** or **Google Play** to stay connected to your care anytime and anywhere.
- Sign in with your NYU Langone Health MyChart account username and password.
- You can schedule appointments, view test results, request prescription refills, send secure messages to your providers, have a virtual urgent care visit, and more.

# Your Medication List as of May 6, 2021  9:17 PM

ⓘ For your privacy, any medications your clinician marked as private are not included in this list. This message appears even if the list is complete. If you have any questions about a medication you don't see here, contact your doctor. Always use your most recent med list.



# Access to Clinical Notes and Test Results

At NYU Langone Health, we believe that sharing information supports patients taking an active role in their health.   In support of this, clinical notes and test results are made available to patients in MyChart and the NYU Langone Health App, as soon as they are available.  This is in accordance with the 21st Century Cures Act, which is intended to give patients and their healthcare providers secure access to health information. (www.healthit.gov/curesrule)

This means that a patient may see test results before their health care provider does.  If you do access your test results right away, please keep in mind that some results may be hard to interpret without guidance from a health care professional.  All results will be reviewed by members of your care team. They will continue to follow-up with you as they have done in the past.

# Allergies as of 5/6/2021

No Known Allergies

**If you feel that any of the information in this summary is inaccurate, please talk with your healthcare provider.**

## Information About Medication Safety

It is important to keep an updated record of the medications you are taking, and to bring this updated list of medications every time you visit your Health Care Provider and when you come to the hospital. We want to help you in managing your medications safely after your visit or discharge. This includes the potential side effects of your medications.  If you have any questions regarding the medications you are taking, please speak to your Health Care Provider or Pharmacist.

## Have questions about your bills?

Our physician and hospital customer service representatives are available to answer any billing questions:  https://nyulangone.org/insurance-billing-financial-assistance

Physician Billing: 1 - 877 - 648 - 2964

Hospital Billing:  1 - 800 - 237 - 6977

## Finding a Physician Within NYU Langone Health

As one of the nation's premier academic medical centers, NYU Langone Health is devoted to excellence in patient care, education, and research. We are proud that our care team includes leading specialists for every condition.

Should you need assistance finding a physician or service, please visit us on our website at https://nyulangone.org/doctors.

To reach us by phone:
NYU Langone Physician Referral Services – (855) 314-2978
NYU Langone Orthopedic Hospital – (888) 453-3627
Family Health Centers at NYU Langone – (718) 630-7942

Additional resources include:

National Suicide Prevention Hotline – **(800) 273-8255**
NYC Suicide Hotline – **(888) 692-9355**



 CDC Centers for Disease Control and Prevention



EXHIBIT D

# COVID-19

# Reinfection with COVID-19

Updated Aug. 6, 2021        Print

Cases of reinfection with COVID-19 have been reported, but remain rare.

In general, reinfection means a person was infected (got sick) once, recovered, and then later became infected again. Based on what we know from similar viruses, some reinfections are expected. We are still learning more about COVID-19. Ongoing COVID-19 studies will help us understand:

- How likely is reinfection
- How often reinfection occurs
- How soon after the first infection can reinfection take place
- How severe are cases of reinfection
- Who might be at higher risk for reinfection
- What reinfection means for a person's immunity
- If a person is able to spread COVID-19 to other people when reinfected

## Delta Variant

The Delta variant causes more infections and spreads faster than earlier forms of the virus that causes COVID-19. It might cause more severe illness than previous strains in unvaccinated people.

- Vaccines continue to reduce a person's risk of contracting the virus that cause COVID-19, including this variant.
- Vaccines continue to be highly effective at preventing hospitalization and death, including against this variant.
- Fully vaccinated people with breakthrough infections from this variant appear to be infectious for a shorter period.
- Get vaccinated and wear masks indoors in public spaces to reduce the spread of this variant.

About the Delta Variant        Variants in the US

## What CDC is doing

CDC is actively working to learn more about reinfection to inform public health action. CDC developed recommendations for public health professionals to help decide when and how to test someone for suspected reinfection. CDC has also provided information for state and local health departments to help investigate suspected cases of reinfection. We will update this guidance as we learn more about reinfection.

## Important Ways to Slow the Spread of COVID-19

- Get a COVID-19 vaccine as soon as you can. Find a vaccine.
- Wear a mask that covers your nose and mouth to help protect yourself and others.
- Stay 6 feet apart from others who don't live with you.
- Avoid crowds and poorly ventilated indoor spaces.
- Wash your hands often with soap and water. Use hand sanitizer if soap and water aren't available.

### More Information

How to Protect Yourself & Others

How Do I Find a COVID-19 Vaccine?

About Variants of the Virus that Causes COVID-19 | CDC

Choosing Safer Activities | CDC

Last Updated Aug. 6, 2021

EXHIBIT  E

 **U.S. Equal Employment Opportunity Commission**

# Pandemic Preparedness in the Workplace and the Americans with Disabilities Act

This technical assistance document was issued upon approval of the Chair of the U.S. Equal Employment Opportunity Commission.

**OLC Control Number:**

EEOC-NVTA-2009-3

**Concise Display Name:**

Pandemic Preparedness in the Workplace and the Americans with Disabilities Act

**Issue Date:**

10-09-2009

**General Topics:**

ADA/GINA

**Summary:**

This document provides information about the ADA and pandemic planning in the workplace.

**Citation:**

ADA, Rehabilitation Act, 29 CFR Part 1630

**Document Applicant:**

Health Care Providers, Employees, Employers, Applicants, HR Practitioners

**Previous Revision:**

No

The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

# I. INTRODUCTORY INFORMATION

## A. PURPOSE

This technical assistance document provides information about Titles I and V of the **Americans with Disabilities Act (https://www.eeoc.gov/statutes/titles-i-and-v-americans-disabilities-act-1990-ada)** (ADA) and Section 501 of the Rehabilitation Act and pandemic planning in the workplace.[1] **(https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#1)** *This document was originally issued in 2009, during the spread of H1N1 virus, and was re-issued on March 19, 2020 and revised thereafter, to incorporate updates regarding the COVID-19 pandemic.* It identifies established ADA principles that are relevant to questions frequently asked about workplace pandemic planning such as:

- How much information may an employer request from an employee who calls in sick, in order to protect the rest of its workforce when an influenza or coronavirus pandemic appears imminent?

- When may an ADA-covered employer take the body temperature of employees during a pandemic?

- Does the ADA allow employers to require employees to stay home if they have symptoms of the pandemic influenza or coronavirus?

- When employees return to work, does the ADA allow employers to require doctors' notes certifying their fitness for duty?

In one instance, to provide a complete answer, this document provides information about religious accommodation and Title VII of the Civil Rights Act of 1964.

## B. BACKGROUND INFORMATION ABOUT PANDEMIC INFLUENZA AND OTHER PANDEMICS

A "pandemic" is a global "epidemic."**(2) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#2)** The world has seen **four** influenza pandemics in the last century. The deadly "Spanish Flu" of 1918 was followed by the milder "Asian" and "Hong Kong" flus of the 1950s and 1960s. While the SARS coronavirus outbreak in 2003 was considered a pandemic "scare,"**(3) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#3)** the H1N1 influenza outbreak in 2009 rose to the level of a pandemic.**(4) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#4)**

**\*On March 11, 2020, the coronavirus disease (COVID-19) was also declared a pandemic.**

The U.S. Department of Health and Human Services (HHS), Centers for Disease Control and Prevention (CDC), and the World Health Organization (WHO) are the definitive sources of information about pandemics. The WHO decides when to declare a pandemic.**(5) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#5)** Pandemic planning and pandemic preparedness include everything from global and national public health strategies to an individual employer's plan about how to continue operations.**(6) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#6)**

**\*The new information added to this EEOC technical assistance document in 2020 about COVID-19 focuses on implementing these strategies in a manner that is consistent with the ADA and with current CDC and state/local guidance for keeping workplaces safe during the COVID-19 pandemic.  This document recognizes that guidance from public health authorities will change as the COVID-19 situation evolves.**

# II. RELEVANT ADA REQUIREMENTS AND STANDARDS

The ADA, which protects applicants and employees from disability discrimination, is relevant to pandemic preparation in at least three major ways. First, the ADA regulates employers' disability-related inquiries and medical examinations for all applicants and employees, including those who do not have ADA disabilities. **(7) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#7)** Second, the ADA prohibits covered employers from excluding individuals with disabilities from the workplace for health or safety reasons unless they pose a "direct threat" (i.e. a significant risk of substantial harm even with reasonable accommodation). **(8) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#8)** Third, the ADA requires reasonable accommodations for individuals with disabilities (absent undue hardship) during a pandemic. **(9) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#9)**

This section summarizes these ADA provisions. The subsequent sections answer frequently asked questions about how they apply during an influenza or coronavirus pandemic. The answers are based on existing EEOC guidance regarding disability-related inquiries and medical examinations, direct threat, and reasonable accommodation. **(10) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#10)**

## A. DISABILITY-RELATED INQUIRIES AND MEDICAL EXAMINATIONS

The ADA prohibits an employer from making **disability-related inquiries** and requiring **medical examinations** of employees, except under limited circumstances, as set forth below. **(11) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#11)**

### 1. Definitions: Disability-Related Inquiries and Medical Examinations

An inquiry is **"disability-related"** if it is likely to elicit information about a disability. **(12) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#12)** For example, asking an individual if his immune system is compromised is a disability-related

inquiry because a weak or compromised immune system can be closely associated with conditions such as cancer or HIV/AIDS.**(13)** **(https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#13)** By contrast, an inquiry is not disability-related if it is not likely to elicit information about a disability. For example, asking an individual about symptoms of a cold or the seasonal flu is not likely to elicit information about a disability.

A **"medical examination"** is a procedure or test that seeks information about an individual's physical or mental impairments or health. **(14) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#14)** Whether a procedure is a medical examination under the ADA is determined by considering factors such as whether the test involves the use of medical equipment; whether it is invasive; whether it is designed to reveal the existence of a physical or mental impairment; and whether it is given or interpreted by a medical professional.

## 2. ADA Standards for Disability-Related Inquiries and Medical Examinations

The ADA regulates disability-related inquiries and medical examinations in the following ways:

- **Before a conditional offer of employment:** The ADA prohibits employers from making disability-related inquiries and conducting medical examinations of applicants before a conditional offer of employment is made.**(15)** **(https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#15)**

- **After a conditional offer of employment, but before an individual begins working:** The ADA permits employers to make disability-related inquiries and conduct medical examinations if all entering employees in the same job category are subject to the same inquiries and examinations.**(16)** **(https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#16)**

- ***NOTE:  New questions 16-19 below address specific questions about hiring during the COVID-19 pandemic.***

- **During employment:** The ADA <u>prohibits</u> employee disability-related inquiries or medical examinations unless they are job-related and consistent with business necessity. Generally, a disability-related inquiry or medical examination of an employee is job-related and consistent with business necessity when an employer has a reasonable belief, based on objective evidence, that:

> An employee's ability to perform essential job functions will be impaired by a medical condition; or
> An employee will pose a direct threat due to a medical condition. **[(17) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#17)](https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#17)**

This reasonable belief "must be based on objective evidence obtained, or reasonably available to the employer, prior to making a disability-related inquiry or requiring a medical examination."**[(18) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#18)](https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#18)**

All information about applicants or employees obtained through disability-related inquiries or medical examinations must be kept **confidential**.**[(19) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#19)](https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#19)** Information regarding the medical condition or history of an employee must be collected and maintained on separate forms and in separate medical files and be treated as a confidential medical record.

## B. DIRECT THREAT

A **"direct threat"** is "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation."**[(20) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#20)](https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#20)** If an individual with a disability poses a direct threat despite reasonable accommodation, he or she is not protected by the nondiscrimination provisions of the ADA.

Assessments of whether an employee poses a direct threat in the workplace must be based on objective, factual information, "not on subjective perceptions . . . [or] irrational fears" about a specific disability or disabilities.**(21) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#21)** The EEOC's regulations identify four factors to consider when determining whether an employee poses a direct threat: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and (4) the imminence of the potential harm.**(22) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#22)**

### DIRECT THREAT AND PANDEMIC INFLUENZA, COVID-19, AND OTHER PUBLIC HEALTH EMERGENCIES

**Direct threat** is an important ADA concept during an influenza or coronavirus pandemic.

Whether pandemic influenza or coronavirus rises to the level of a direct threat depends on the severity of the illness. If the CDC or state or local public health authorities determine that the illness is like seasonal influenza or the 2009 spring/summer H1N1 influenza, it would not pose a direct threat or justify disability-related inquiries and medical examinations. By contrast, if the CDC or state or local health authorities determine that pandemic influenza or coronavirus is significantly more severe, it could pose a direct threat. The assessment by the CDC or public health authorities would provide the objective evidence needed for a disability-related inquiry or medical examination.

During a pandemic, employers should rely on the latest CDC and state or local public health assessments. While the EEOC recognizes that public health recommendations may change during a crisis and differ between states, employers are expected to make their best efforts to obtain public health advice that is contemporaneous and appropriate for their location, and to make reasonable assessments of conditions in their workplace based on this information.

**\*Based on guidance of the CDC and public health authorities as of March 2020, the COVID-19 pandemic meets the direct threat standard.  The CDC and other public health authorities have acknowledged that COVID-19 is highly contagious and potentially fatal. Due to the community spread of COVID-19 in the United States, these authorities have issued precautions to slow the spread, such as urging significant restrictions on public gatherings.  In addition, numerous state and local authorities have issued closure orders for businesses, entertainment and sport venues, and schools in order to avoid bringing people together in close quarters due to the risk of contagion or instituted masking requirements in public places.  These facts manifestly support a finding that a significant risk of substantial harm would be posed by having someone with COVID-19, or symptoms of it, present in the workplace at the current time.  At such time as the CDC and state/local public health authorities revise their assessment of the spread and severity of COVID-19, that could affect whether a direct threat still exists.**

## C. REASONABLE ACCOMMODATION

A **"reasonable accommodation"** is a change in the work environment that allows an individual with a disability to have an equal opportunity to apply for a job, perform a job's essential functions, or enjoy equal benefits and privileges of employment.[23] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#23)

An accommodation poses an **"undue hardship"** if it results in significant difficulty or expense for the employer, taking into account the nature and cost of the accommodation, the resources available to the employer, and the operation of the employer's business.[24] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#24) If a particular accommodation would result in an undue hardship, an employer is not required to provide it but still must consider other accommodations that do not pose an undue hardship.[25] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#25)

Generally, the ADA requires employers to provide reasonable accommodations for known limitations of applicants and employees with disabilities. **(26) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#26)**

# III. ADA-COMPLIANT EMPLOYER PRACTICES FOR PANDEMIC PREPAREDNESS

The following Questions and Answers are designed to help employers plan how to manage their workforce in an ADA-compliant manner before and during a pandemic.

## A. BEFORE A PANDEMIC

HHS advises employers to begin their pandemic planning by identifying a "pandemic coordinator and/or team with defined roles and responsibilities for preparedness and response planning."**(27) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#27)** This team should include staff with expertise in all equal employment opportunity laws. **(28) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#28)** Employees with disabilities should be included in planning discussions, and employer communications concerning pandemic preparedness should be accessible to employees with disabilities.

When employers begin their pandemic planning, a common ADA-related question is whether they may survey the workforce to identify employees who may be more susceptible to complications from pandemic influenza or coronavirus than most people.

**1. Before an influenza or coronavirus pandemic occurs, may an ADA-covered employer ask an employee to disclose if he or she has a compromised immune system or chronic health condition that the CDC says could make him or her more susceptible to complications of influenza or coronavirus?**

No. An inquiry asking an employee to disclose a compromised immune system or a chronic health condition is disability-related because the response is likely to disclose the existence of a disability. **(29) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#29)** The ADA does not permit such an inquiry in the absence of objective evidence that pandemic symptoms will cause a direct threat. Such evidence is completely absent before a pandemic occurs.

**2. Are there ADA-compliant ways for employers to identify which employees are more likely to be unavailable for work in the event of a pandemic?**

Yes. Employers may make inquiries that are not disability-related. An inquiry is not disability-related if it is designed to identify potential non-medical reasons for absence during a pandemic (e.g., curtailed public transportation) on an equal footing with medical reasons (e.g., chronic illnesses that increase the risk of complications). The inquiry should be structured so that the employee gives one answer of "yes" or "no" to the whole question without specifying the factor(s) that apply to him. The answer need not be given anonymously.

Below is a sample ADA-compliant survey that can be given to employees to anticipate absenteeism.

**ADA-COMPLIANT PRE-PANDEMIC EMPLOYEE SURVEY**

Directions: Answer "yes" to the whole question *without specifying the factor that applies to you*. Simply check "yes" or "no" at the **bottom of the page**.

**In the event of an influenza or coronavirus pandemic, would you be unable to come to work because of any one of the following reasons:**

- If schools or day-care centers were closed, you would need to care for a child;

- If other services were unavailable, you would need to care for other dependents;

- If public transport were sporadic or unavailable, you would be unable to travel to work; and/or;

- If you or a member of your household fall into one of the categories identified by the CDC as being at high risk for serious complications from the pandemic influenza virus, you would be advised by public health authorities not to come to work (e.g., pregnant women; persons with compromised immune systems due to cancer, HIV, history of organ transplant or other medical conditions; persons less than 65 years of age with underlying chronic conditions; or persons over 65).

**Answer: YES_____ , NO_____**

**3. May an employer require *new entering employees* to have a post-offer medical examination to determine their general health status?**

Yes, if all entering employees in the same job category are required to undergo the medical examination[(30) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#30)] and if the information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record.

**Example A**: An employer in the international shipping industry implements its pandemic plan when the WHO and the CDC confirm that a pandemic may be imminent because a new influenza or coronavirus is infecting people in multiple regions, but not yet in North America. Much of the employer's international business is in the affected regions. The employer announces that, effective immediately, its post-offer medical examinations for all entering international pilots and flight crew will include procedures to identify medical conditions that the CDC associates with an increased risk of

complications from the pandemic influenza or coronavirus. Because the employer gives these medical examinations post-offer to all entering employees in the same job categories, the examinations are ADA-compliant.

**4. May an employer rescind a job offer made to an applicant based on the results of a post-offer medical examination if it reveals that the applicant has a medical condition that puts her at increased risk of complications from the pandemic influenza or coronavirus?**

No, unless the applicant would pose a direct threat within the meaning of the ADA. A finding of "direct threat" must be based on reasonable medical judgment that relies on the most current medical knowledge and/or the best available evidence such as objective information from the CDC or state or local health authorities. The finding must be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job, after considering, among other things, the imminence of the risk; the severity of the harm; and the availability of reasonable accommodations to reduce the risk. Before concluding that an individual poses a direct threat, the employer must determine whether a reasonable accommodation could reduce the risk below the direct threat level.

**Example B**: The same international shipping employer offers a financial position at its U.S. headquarters to Steve. This position does not involve regular contact with flight crew or travel to the affected WHO region. Steve's post-offer medical examination (which is the same examination given to all U.S. headquarters employees) reveals that Steve has a compromised immune system due to recent cancer treatments. Given the fact that the position does not involve regular contact with flight crew or travel, and that the virus has not spread to North America, Steve would not face a significant risk of contracting the virus at work and does not pose a "direct threat" to himself or others in this position. Under the ADA, it would be discriminatory to rescind Steve's job offer based on the possibility of an influenza or coronavirus pandemic.

### B. DURING AN INFLUENZA OR CORONAVIRUS PANDEMIC

The following questions and answers discuss employer actions when the WHO and the CDC report an influenza or coronavirus pandemic.

**5. May an ADA-covered employer send employees home if they display influenza-like symptoms during a pandemic?**

Yes. The CDC states that employees who become ill with symptoms of influenza-like illness at work during a pandemic should leave the workplace. Advising such workers to go home is not a disability-related action if the illness is akin to seasonal influenza or the 2009 spring/summer H1N1 virus. Additionally, the action would be permitted under the ADA if the illness were serious enough to pose a direct threat.  **\*Applying this principle to current CDC guidance on COVID-19, this means an employer can send home an employee with COVID-19 or symptoms associated with it.**

**6. During a pandemic, how much information may an ADA-covered employer request from employees who report feeling ill at work or who call in sick?**

ADA-covered employers may ask such employees if they are experiencing influenza-like symptoms, such as fever or chills <u>and</u> a cough or sore throat. Employers must maintain all information about employee illness as a confidential medical record in compliance with the ADA.

If pandemic influenza is like seasonal influenza or spring/summer 2009 H1N1, these inquiries are not disability-related. If pandemic influenza becomes severe, the inquiries, even if disability-related, are justified by a reasonable belief based on objective evidence that the severe form of pandemic influenza poses a direct threat.

**\*Applying this principle to current CDC guidance on COVID-19, employers may ask employees who report feeling ill at work, or who call in sick, questions about their symptoms to determine if they have or may have COVID-19.  Currently these symptoms**

include, for example, fever, chills, cough, shortness of breath, or sore throat.

**7. During a pandemic, may an ADA-covered employer take its employees' temperatures to determine whether they have a fever?**

Generally, measuring an employee's body temperature is a medical examination. If pandemic influenza symptoms become more severe than the seasonal flu or the H1N1 virus in the spring/summer of 2009, or if pandemic influenza becomes widespread in the community as assessed by state or local health authorities or the CDC, then employers may measure employees' body temperature.

However, employers should be aware that some people with influenza - including the 2009 H1N1 virus* - **or with COVID-19** do not have a fever.

**\*Because the CDC and state/local health authorities have acknowledged community spread of COVID-19 and issued attendant precautions as of March 2020, employers may measure employees' body temperature. As with all medical information, the fact that an employee had a fever or other symptoms would be subject to ADA confidentiality requirements.**

**8. When an employee returns from travel during a pandemic, must an employer wait until the employee develops influenza symptoms to ask questions about exposure to pandemic influenza during the trip?**

No. These would not be disability-related inquiries. If the CDC or state or local public health officials recommend that people who visit specified locations remain at home for several days until it is clear they do not have pandemic influenza symptoms, an employer may ask whether employees are returning from these locations, even if the travel was personal. **(31) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#31)**

**\*Similarly, with respect to the current COVID-19 pandemic, employers may follow the advice of the CDC and state/local public health authorities regarding information needed to permit an employee's return to the workplace after visiting a specified location, whether for business or personal reasons.**

**9. During a pandemic, may an ADA-covered employer ask employees *who do not have influenza or coronavirus symptoms* to disclose whether they have a medical condition that the CDC says could make them especially vulnerable to influenza or coronavirus complications?**

No. If pandemic influenza or coronavirus is like seasonal influenza or the H1N1 virus in the spring/summer of 2009, making disability-related inquiries or requiring medical examinations of employees *without* symptoms is prohibited by the ADA.**[32] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#32)** However, under these conditions, employers should allow employees who experience flu-like symptoms to stay at home, which will benefit all employees including those who may be at increased risk of developing complications.**[33] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#33)**

If an employee voluntarily discloses (without a disability-related inquiry) that he has a specific medical condition or disability that puts him or her at increased risk of influenza or coronavirus complications, the employer must keep this information confidential. The employer may ask him to describe the type of assistance he thinks will be needed (e.g. telework or leave for a medical appointment). Employers should not assume that all disabilities increase the risk of influenza or coronavirus complications. Many disabilities do not increase this risk *(e.g.* vision or mobility disabilities).

If an influenza or coronavirus pandemic becomes more severe or serious according to the assessment of local, state or federal public health officials, ADA-covered employers may have sufficient objective information from public health advisories to reasonably conclude that employees will face a direct threat if they contract pandemic influenza

or coronavirus. (34) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#34) Only in this circumstance may ADA-covered employers make disability-related inquiries or require medical examinations of asymptomatic employees to identify those at higher risk of influenza or coronavirus complications.

### 10. May an employer encourage employees to telework (i.e., work from an alternative location such as home) as an infection-control strategy during a pandemic?

Yes. Telework is an effective infection-control strategy that is also familiar to ADA-covered employers as a reasonable accommodation. (35) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#35)

In addition, employees with disabilities that put them at high risk for complications of pandemic influenza or coronavirus may request telework as a reasonable accommodation to reduce their chances of infection during a pandemic.

### 11. During a pandemic, may an employer require its employees to adopt infection-control practices, such as regular hand washing, at the workplace?

Yes. Requiring infection control practices, such as regular hand washing, coughing and sneezing etiquette, and proper tissue usage and disposal, does not implicate the ADA.

### 12. During a pandemic, may an employer require its employees to wear personal protective equipment (e.g., face masks, gloves, or gowns) designed to reduce the transmission of pandemic infection?

Yes. An employer may require employees to wear personal protective equipment during a pandemic. However, where an employee with a disability needs a related reasonable accommodation under the ADA (e.g., non-latex gloves, or gowns designed for individuals who use

wheelchairs), the employer should provide these, absent undue hardship.

**13. May an employer covered by the ADA and Title VII of the Civil Rights Act of 1964 compel all of its employees to take the influenza or COVID-19 vaccine regardless of their medical conditions or their religious beliefs during a pandemic?**

No. An employee may be entitled to an exemption from a mandatory vaccination requirement based on an ADA disability that prevents him from taking the vaccine. This would be a reasonable accommodation barring undue hardship (significant difficulty or expense). Similarly, under Title VII of the Civil Rights Act of 1964, once an employer receives notice that an employee's sincerely held religious belief, practice, or observance prevents him from taking the vaccine, the employer must provide a reasonable accommodation unless it would pose an undue hardship as defined by Title VII ("more than de minimis cost" to the operation of the employer's business, which is a lower standard than under the ADA). **(36) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#36)**

Generally, ADA-covered employers should consider simply encouraging employees to get the influenza vaccine rather than requiring them to take it.

See Section K., "Vaccinations," in "**What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#K)** ."

**14. During a pandemic, must an employer continue to provide reasonable accommodations for employees with known disabilities that are unrelated to the pandemic, barring undue hardship?**

Yes. An employer's ADA responsibilities to individuals with disabilities continue during an influenza or coronavirus pandemic. Only when an employer can demonstrate that a person with a disability poses a

direct threat, even after reasonable accommodation, can it lawfully exclude him from employment or employment-related activities.

If an employee with a disability needs the same reasonable accommodation at a telework site that he had at the workplace, the employer should provide that accommodation, absent undue hardship. In the event of undue hardship, the employer and employee should cooperate to identify an alternative reasonable accommodation.

**Example C**: An accountant with low vision has a screen-reader on her office computer as a reasonable accommodation. In preparation for telework during a pandemic or other emergency event, the employer issues notebook computers to all accountants. In accordance with the ADA, the employer provides the accountant with a notebook computer that has a screen-reader installed.

All employees with disabilities whose responsibilities include management during a pandemic must receive reasonable accommodations necessitated by pandemic conditions, unless undue hardship is established.

**Example D**: A manager in a marketing firm has a hearing disability. A sign language interpreter facilitates her communication with other employees at the office during meetings and trainings. Before the pandemic, the employer decided to provide video phone equipment and video relay software for her at home to use for emergency business consultations. (Video relay services allow deaf and hearing impaired individuals to communicate by telephone through a sign language interpreter by placing a video relay call.**[37]** **(https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#37)**.) During a pandemic, this manager also is part of the employer's emergency response team. When she works from home during the pandemic, she uses the video relay services to participate in daily management and staff conference calls necessary to keep the firm operational.

**\*The rapid spread of COVID-19 has disrupted normal work routines and may have resulted in unexpected or increased requests for**

reasonable accommodation.  Although employers and employees should address these requests as soon as possible, the extraordinary circumstances of the COVID-19 pandemic may result in delay in discussing requests and in providing accommodation where warranted.  Employers and employees are encouraged to use interim solutions to enable employees to keep working as much as possible.

**15. During a pandemic, may an employer ask an employee why he or she has been absent from work if the employer suspects it is for a medical reason?**

Yes. Asking why an individual did not report to work is not a disability-related inquiry. An employer is always entitled to know why an employee has not reported for work.

**Example E**: During an influenza pandemic, an employer directs a supervisor to contact an employee who has not reported to work for five business days without explanation. The supervisor asks this employee why he is absent and when he will return to work. The supervisor's inquiry is not a disability-related inquiry under the ADA.

## *HIRING DURING THE COVID-19 PANDEMIC

**\*16. If an employer is hiring, may it screen applicants for symptoms of COVID-19?**

**\*Yes. An employer may screen job applicants for symptoms of COVID-19 after making a conditional job offer, as long as it does so for all entering employees in the same type of job. This ADA rule allowing post-offer (but not pre-offer) medical inquiries and exams applies to all applicants, whether or not the applicant has a disability.**

**\*17. May an employer take an applicant's temperature as part of a post-offer, pre-employment medical exam?**

**\*Yes.  Any medical exams are permitted after an employer has made a conditional offer of employment.  However, employers should be aware that some people with COVID-19 do not have a fever.**

**\*18. May an employer delay the start date of an applicant who has COVID-19 or symptoms associated with it?**

**\*Yes.  According to current CDC guidance, an individual who has COVID-19 or symptoms associated with it should not be in the workplace.**

**\*CDC has issued guidance applicable to all workplaces generally, but also has issued more specific guidance for particular types of workplaces (e.g. health care employees). Guidance from public health authorities is likely to change as the COVID-19 pandemic evolves.  Therefore, employers should continue to follow the most current information on maintaining workplace safety. To repeat: the ADA does not interfere with employers following recommendations of the CDC or public health authorities, and employers should feel free to do so.**

**\*19. May an employer withdraw a job offer when it needs the applicant to start immediately, but the individual has COVID-19 or symptoms of it?**

\*Based on current CDC guidance, this individual cannot safely enter the workplace, and therefore the employer may withdraw the job offer if the employee is unable to work or would need to work in a location where the employee's presence could endanger others through exposure to COVID-19.

## C. AFTER A PANDEMIC

**20. May an ADA-covered employer require employees who have been away from the workplace during a pandemic to provide a doctor's note certifying fitness to return to work?**

Yes. Such inquiries are permitted under the ADA either because they would not be disability-related or, if the influenza or coronavirus pandemic were truly severe, they would be justified under the ADA standards for disability-related inquiries of employees.

As a practical matter, however, doctors and other health care professionals may be too busy during and immediately after a pandemic outbreak to provide fitness-for-duty documentation. Therefore, new approaches may be necessary, such as reliance on local clinics to provide a form, a stamp, or an e-mail to certify that an individual does not have the pandemic virus.

## IV. EEOC AND RELATED RESOURCES

Employers are encouraged to consult the following EEOC publications for further information about the **Americans with Disabilities Act (https://www.eeoc.gov/disability-discrimination)** , as well as other agency materials regarding COVID-19.

- **Disability-Related Inquiries and Medical Examinations**:
  - *Disability-Related Inquiries & Medical Examinations of Employees Under the ADA* (2000) at **https://www.eeoc.gov/policy/docs/guidance-inquiries.html (https://www.eeoc.gov/policy/docs/guidance-inquiries.html)** ;

  - *Obtaining and Using Employee Medical Information as Part of Emergency Evacuation Procedures* (2001) at **https://www.eeoc.gov/facts/evacuation.html (https://www.eeoc.gov/fact-sheet/fact-sheet-obtaining-and-using-employee-medical-information-part-emergency-evacuation)** ;

  - Enforcement Guidance: *Preemployment Disability-Related Questions & Medical Examinations* (1995) at **https://www.eeoc.gov/policy/docs/preemp.html (https://www.eeoc.gov/policy/docs/preemp.html)** .

- **Reasonable Accommodation and Undue Hardship**: Enforcement Guidance: *Reasonable Accommodation and Undue Hardship under the*

*ADA* (as revised 2002)
at **https://www.eeoc.gov/policy/docs/accommodation.html
(https://www.eeoc.gov/policy/docs/accommodation.html)** .

- **Telework as a Reasonable Accommodation**: *Work at Home/Telework as a Reasonable Accommodation* (2003)
  at **https://www.eeoc.gov/facts/telework.html
  (https://www.eeoc.gov/fact-sheet/work-hometelework-reasonable-accommodation)** .

- **Centers for Disease Prevention and Control:  www.cdc.gov
  (http://www.cdc.gov)**

  - **CDC Guidance for Employers and Workplaces on COVID-19:
    https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html
    (https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html)**

- **U.S. Department of Labor**

  - **Occupational Safety and Health Administration
    https://www.osha.gov/ (https://www.osha.gov/)**

    **"Preparing Workplaces for COVID-19,"
    https://www.osha.gov/Publications/OSHA3990.pdf
    (https://www.osha.gov/Publications/OSHA3990.pdf)**

  - **Wage and Hour Division**

    **"COVID-19 or Other Public Health Emergencies and the Family
    and Medical Leave Act"
    https://www.dol.gov/agencies/whd/fmla/pandemic
    (https://www.dol.gov/agencies/whd/fmla/pandemic)**

---

**Endnotes**

1. 42 U.S.C. §§ 12111–12117, 12201–12213. EEOC is revising its ADA regulations to comply with the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, which was effective on January 1, 2009. 74 Fed.Reg. 48,431 (Sept. 23, 2009). While the Amendments expand ADA coverage, they do not change the ADA requirements

concerning disability-related inquiries and medical examinations; the requirement of reasonable accommodation barring undue hardship; or the analysis of direct threat.

2. An "epidemic" is an outbreak of disease that occurs suddenly in numbers significantly greater than normal, but which spreads only within communities, states, or a limited number of countries. **http://www.flu.gov/glossary/#E (http://www.flu.gov/glossary/#E)** . Such an outbreak usually occurs when a pathogen mutates, allowing it to evade the human immune system. **http://www.flu.gov/individualfamily/about/index.html (http://www.flu.gov/individualfamily/about/index.html)** .

3. U.S. Dep't of Health & Human Servs., Pandemics and Pandemic Scares of the 20th Century, **https://www.cdc.gov/flu/pandemic-resources/basics/past-pandemics.html (https://www.cdc.gov/flu/pandemic-resources/basics/past-pandemics.html)** (last visited Sept. 22, 2009). The most severe influenza pandemic in the last century was the Spanish Flu Pandemic of 1918-1919, which killed 675,000 people in the United States and 50 million people worldwide at the end of World War I. The Spanish Flu targeted young, healthy adults and was often fatal within a few days. This virus caused the immune system to attack the respiratory system, which explains why young adults with vigorous immune systems were especially vulnerable. David M. Morens & Jeffery K. Taubenberger, *1918 Influenza: The Mother of all Pandemics*, 12 Emerging Infections Diseases 15 (2006), **https://wwwnc.cdc.gov/eid/article/12/1/05-0979_article (https://wwwnc.cdc.gov/eid/article/12/1/05-0979_article)** .

4. *World facing global A(H1N1) flu pandemic, announces UN health agency*, UN News Service, June 11, 2009, **http://www.un.org/apps/news/story.asp?NewsID=31106&Cr=h1n1&Cr1 (http://www.un.org/apps/news/story.asp?NewsID=31106&Cr=h1n1&Cr1)** (also noting that H1N1 tends to infect people under 25 years old, with approximately two percent of cases resulting in severe or life-threatening symptoms).

5. The WHO defines the following specific pandemic phases worldwide:

- **Phase 1**: No new influenza virus subtypes have been detected in humans. An influenza virus subtype that has caused human infection may be present in animals. If present in animals, the risk of human disease is considered to be low.

- **Phase 2**. No new influenza virus subtypes have been detected in humans. However, a circulating animal influenza virus subtype poses a substantial risk of human disease.

- **Phase 3**. Human infection with a new subtype, but no human-to-human spread, or at most rare instances of spread to a close contact.

- **Phase 4**. Small cluster(s) with limited human-to-human transmission but spread is highly localized, suggesting that the virus is not well adapted to humans.

- **Phase 5**. Larger cluster(s) but human-to-human spread of the virus still localized, suggesting that the virus is becoming increasingly better adapted to humans, but may not yet be fully transmissible (substantial pandemic risk).

- **Phase 6**. Pandemic phase: increased and sustained transmission in general population.

6. *See* Ctrs. for Disease Control & Prevention, Guidance for Businesses and Employers to Plan and Respond to the 2009-2010 Influenza Season (2009), **http://www.pandemicflu.gov/professional/business/guidance.pdf (http://www.pandemicflu.gov/professional/business/guidance.pdf)** ; Ctrs. for Disease Control & Prevention, Resources for Businesses and Employers – COVID-19, **https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html (https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html)** .

7. 42 U.S.C. § 12112(d)(4)(A); *Conroy v. New York State Dep't of Corr. Servs*., 333 F.3d 88, 94-95 (2d Cir. 2003); *Fredenburg v. Contra Costa County Dep't of Health Servs*., 172 F. 3d 1176, 1182 (9th Cir. 1999); *Roe v. Cheyenne Mountain Conference Resort, Inc*., 124 F.3d 1221, 1229 (10th Cir. 1997)*; see also* Equal Employment Opportunity Comm'n, Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations § B.1 (1995), **https://www.eeoc.gov/policy/docs/preemp.html (https://www.eeoc.gov/policy/docs/preemp.html)** .

8. 42 U.S.C. §§ 12111(3), (8); 29 C.F.R. §§ 1630.2(r), 1630.15(b)(2).

9. 42 U.S.C. § 12112(b)(5); *see also* § 12111(3); 29 C.F.R. § 1630.2(r).

10. These ADA standards apply to federal sector complaints of non-affirmative action employment discrimination arising under section 501 of the Rehabilitation Act of 1973. 29 U.S.C. § 791(g) (1994). It also applies to complaints of non-affirmative action employment discrimination arising under section 503 and employment discrimination under section 504 of the Rehabilitation Act. 29 U.S.C. §§ 793(d), 794(d) (1994).

11. 42 U.S.C. § 12112(d). Equal Employment Opportunity Comm'n, **Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act (https://www.eeoc.gov/policy/docs/guidance-inquiries.html)** , § B of "General Principles" (2000), **https://www.eeoc.gov/policy/docs/guidance-inquiries.html#4 (https://www.eeoc.gov/policy/docs/guidance-inquiries.html#4)** [hereinafter Inquiries and Exams].

12. Inquiries and Exams, *supra* note 11, at § B.1 of "General Principles." *See also Conroy*, 333 F.3d at 95-96 (citing ADA and relevant EEOC guidance and holding that an employer's request for a "general diagnosis" from employees returning from sick leave absence is a disability-related inquiry regulated by the ADA because it "tend[ed] to reveal a disability").

13. *See* Am. Cancer Soc'y, Should Cancer Patients Get a Flu Shot? (Oct. 17, 2008), **https://www.cdc.gov/cancer/flu/basic-info.htm (https://www.cdc.gov/cancer/flu/basic-info.htm)** (noting that "[i]t is common for people during cancer treatment to have weakened immune systems"); *see also* Ctrs. for Disease Control & Prevention, Basic AIDS/HIV Information (Sept. 3, 2008), **http://www.cdc.gov/hiv/topics/basic/ (https://www.cdc.gov/hiv/basics/whatishiv.html)** (reporting that "HIV . . . attacks the immune system . . .[and] [h]aving AIDS means that the virus has weakened the immune system").

14. Inquiries and Exams, *supra* note 11, at § B.2 of "General Principles."

15. 42 U.S.C. § 12112(d)(2)(A).

16. 42 U.S.C. § 12112(d)(3)(A); *see also* 29 C.F.R. § 1630.14(b).

17. Inquiries and Exams, *supra* note 11, at § A.5 of "Job-Related and Consistent with Business Necessity;" *see also Conroy*, 333 F.3d at 97.

18. *See* Inquiries and Exams, *supra* note 11, at § A.5 of "Job-Related and Consistent with Business Necessity."

19. Medical information on employees or applicants is confidential with the following exceptions: (1)supervisor[s] and managers may be told about necessary restrictions on work duties and about necessary accommodations; (2) first aid and safety personnel may be told if the disability might require emergency treatment; (3) government officials may access the information when investigating compliance with the ADA; (4) employers may give information to state workers' compensation offices, state second injury funds, or workers' compensation insurance carriers in accordance with state workers' compensation laws; and (5) employers may use the information for insurance purposes. 29 C.F.R. §§ 1630.14(b)(1)(i)–(iii), (c)(1)(i)–(iii); 29 C.F.R. pt. 1630 app. § 1630.14(b).

20. 29 C.F.R. § 1630.2(r).

21. *Id.*; 29 C.F.R. pt. 1630 app. § 1630.2(r).

22. *Id.*

23. 29 C.F.R. pt. 1630 app. § 1630.2(o); *see also U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 416 (2002) (citing the Appendix).

24. 42 U.S.C. § 12111(10); *see also* 29 C.F.R. § 1630.2(p) (including factors to consider when determining undue hardship); 29 C.F.R. pt. 1630 app. § 1630.2(p) (providing a more detailed analysis and examples of where a requested reasonable accommodation would pose an undue hardship).

25. 42 U.S.C. § 12112(b)(5)(A); *see also* Equal Employment Opportunity Comm'n, Revised Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act ( 2002), **https://www.eeoc.gov/policy/docs/accommodation.html#undue (https://www.eeoc.gov/policy/docs/accommodation.html#undue)** [hereinafter Reasonable Accommodation Guidance].

26. 42 U.S.C. § 12112(b)(5)(A).

27. *See* U.S. Dep't of Health and Human Servs., Business Pandemic Influenza Planning Checklist: Item 1.1, **http://www.pandemicflu.gov/professional/business/businesschecklist.htm**

**l (http://www.pandemicflu.gov/professional/business/businesschecklist.html)** (last visited Sept. 22, 2009).

28. *See* Job Accommodation Network,Considering the Needs of Employees with Disabilities During a Pandemic Flu Outbreak (2009), **https://askjan.org/blogs/jan/2020/03/the-ada-and-managing-reasonable-accommodation-requests-from-employees-with-disabilities-in-(https://askjan.org/blogs/jan/2020/03/the-ada-and-managing-reasonable-accommodation-requests-from-employees-with-disabilities-in-response-to-covid-19.cfm)** (the Job Accommodation Network is a service of the U.S Department of Labor's Office of Disability Employment Policy).

29. Inquiries and Exams, *supra* note 11, at § B.1, "General Principles."

30. 42 U.S.C. § 12112(d)(3).

31. *See infra* Q & A 16 for a discussion of when an employer may require a medical release as a condition of returning to work.

32. Asking employees if they are immuno-compromised or have a chronic condition is a disability-related inquiry subject to the ADA's restrictions. When pandemic influenza symptoms only resemble those of seasonal influenza, they do not provide an objective basis for a "reasonable belief" that employees will face a direct threat if they become ill. Therefore, they do not justify disability-related inquiries or medical examinations.

33. *See also* Ctrs. for Disease Control, *supra* note 5, at 7. ADA-covered employers may receive requests for reasonable accommodation from individuals with disabilities that place them at risk of influenza or coronavirus complications.

34. *Id.* at 10–11.

35. Telework (i.e., working from an alternative location) is an example of "social distancing," which public health authorities may require in the event of a pandemic. "Social distancing" reduces physical contact between people to minimize disease transmission by, for example, avoiding hand-shakes and keeping a distance from others in public places. Other social distancing practices that may be implemented during a pandemic include: "closing schools; canceling public gatherings; planning for liberal work leave policies; . . . voluntary isolation of [pandemic infection] cases; and voluntary quarantine of household contacts." Ctrs. for Disease Control &

Prevention, Pandemic Influenza Mitigation, **https://www.cdc.gov/flu/pandemic-resources/planning-preparedness/community-mitigation.html (https://www.cdc.gov/flu/pandemic-resources/planning-preparedness/community-mitigation.html)** (last visited Sept. 22, 2009). Employees with disabilities may request telework as a reasonable accommodation, even if the employer does not have a policy allowing it. *See* Equal Employment Opportunity Comm'n, Work at Home/Telework as a Reasonable Accommodation (Oct 27, 2005), **https://www.eeoc.gov/facts/telework.html (https://www.eeoc.gov/fact-sheet/work-hometelework-reasonable-accommodation)** .

36. Equal Employment Opportunity Comm'n, EEOC Compliance Manual Section 12: Religious Discrimination 56-65 (2008), **https://www.eeoc.gov/policy/docs/religion.pdf (https://www.eeoc.gov/sites/default/files/migrated_files/laws/guidance/religion.pdf)** .

37. For general information about video relay service, see Fed. Commc'ns Comm'n, Video Relay Services (Oct. 21, 2008), **https://www.fcc.gov/consumers/guides/video-relay-services (https://www.fcc.gov/consumers/guides/video-relay-services)** .

thenewamerican.com

EXHIBIT  F

# CDC Admits: No Conclusive Evidence Cloth Masks Work Against COVID - The New American

6-8 minutes



Janna Danilova/iStock/Getty Images Plus

In a recent report in *Emerging Infectious Diseases*, the U.S. Centers for Disease Control and Prevention (CDC) suggests what experts have stated all along: There is no conclusive evidence that cloth masks protects users from coronavirus, especially since most people do not use them correctly and do not keep them clean.

The report states:

More research on cloth masks is needed to inform their use as an alternative to surgical masks/respirators in the event of shortage or high-demand situations. To our knowledge, only 1 randomized controlled trial has been conducted to examine the efficacy of cloth masks in healthcare settings, and the results do not favor use of cloth masks.

More randomized controlled trials should be conducted in community settings to test the efficacy of cloth masks against respiratory infections.

There is increasing evidence that cloth masks not only may be ineffective against stopping coronavirus transmission, but that they may actually increase the spread of the virus, as well as worsening other health conditions.

A September report by the CDC found that more than 70 percent of COVID-positive patients contracted the virus in spite of faithful mask wearing while in public. Moreover, 14 percent of the patients who said they "often" wore masks were also infected. Meanwhile, just four percent of the COVID-positive patients said they "never" wore masks in the 14 days before the onset of their illness.

Likewise, the CDC's October journal report references a 2015 study on cloth mask efficacy that found that rates of infection were "consistently higher" among those in the cloth mask group versus that of the medical mask and control groups. The authors of the study suggested it was likely that the cloth masks were problematic because they retained moisture and had poor filtration.

The CDC writes of that study, "This finding suggest that risk for infection was higher for those wearing cloth masks."

The *California Globe* also observed that extensive randomized control trial (RCT) studies and meta-analysis reviews of those studies have shown that masks and respirators are ineffective against the spread of influenza-like illnesses and respiratory illnesses believed to be spread by droplet and aerosol particles. The *Globe* cited an analysis of 10 "randomized controlled tests" (RCTs) by the Center for Disease Control found "no significant reduction in influenza transmission with the use of face masks."

"There is limited evidence for their [masks] effectiveness in preventing influenza virus transmission," the studies found. This applied to masks "worn by the infected person for source control OR when worn by uninfected persons." They concluded that there was "no significant effect of face masks on transmission of laboratory-confirmed influenza."

Yet the CDC continues to recommend cloth masks for public use, even as the organization has flip-flopped on whether the virus is airborne. Their latest assertion is that airborne transmission is "sometimes" possible "under special circumstances."

However, some experts have been sounding the alarm on the widespread use of masks, asserting they may cause more harm than good.

In fact, a group of doctors in Oklahoma is suing the Tulsa mayor and the Tulsa Health Department over the city's mask mandate, asserting masks cause healthy people to become sick.

"On the OSHA website it states that employers shouldn't make employees work in an environment where they have less than a 19.5 percent oxygen level," said Clayton Clark, one of the plaintiffs. "And the mandated masks cause employees to dip below a 19.5 percent oxygen level within 10 seconds of wearing a mask, so I don't want to make my healthy employees sick."

Another plaintiff, Dr. James Meehan, MD, said he has seen an increase in patients with facial rashes, as well as fungal and bacterial infections, and has heard from colleagues around the globe that bacterial pneumonia is on the rise. He asserts this increase stems directly from mask wearing.

"Why might that be? Because untrained members of the public are wearing medical masks, repeatedly … in a non-sterile fashion…. They're becoming contaminated," he said at an August press conference. "They're pulling them off of their car seat, off the rearview mirror, out of their pocket, from their countertop, and they're reapplying a mask that should be worn fresh and sterile every single time."

"New research is showing that cloth masks may be increasing the aerosolization of the SARS-COV-2 virus into the environment causing an increased transmission of the disease," he added.

Dentists have also reported increases in oral hygiene issues, which they have dubbed "mask mouth."

"We're seeing inflammation in people's gums that have been healthy forever, and cavities in people who have never had them before," says Dr. Rob Ramondi, a dentist and co-founder of One Manhattan Dental. "About 50% of our patients are being impacted by this, [so] we decided to name it 'mask mouth' — after 'meth mouth.'"

On the other hand, Sweden has declared virtual victory over the coronavirus, absent any draconian responses to the pandemic such as mask mandates and lockdowns, opting instead for "herd immunity."

"Sweden has gone from being the country with the most infections in Europe to the safest one," Sweden's senior epidemiologist Dr. Anders Tegnell told Italian newspaper *Corriere della Sera.*

"The findings that have been produced through face masks are astonishingly weak, even though so many people around the world wear them," Tengell states.

The European Center for Disease Control and Prevention confirmed Sweden's reduction in infection rates, with just 12 cases per million, Summit News reported.

Reports by the CDC reveal that just six percent of reported COVID-19 deaths came directly from the virus, while a whopping 94 percent of the deaths attributed to the coronavirus were from people who had two to three serious underlying conditions, in addition to COVID-19.

**aa@neg.com**                                                    EXHIBIT  G

| | |
|---|---|
| **From:** | WDW Guest Services <guest.services@disneyworld.com> |
| **Sent:** | Sunday, September 5, 2021 5:30 PM |
| **To:** | Aaron Abadi |
| **Subject:** | Re: Email from the Walt Disney World Resort |

---

## Jared Fields (Disney Parks)

Sep 5, 2021, 5:29 PM EDT

Dear Aaron,

Thank you for reaching out to us about the current face coverings requirement at our Resort.

Face coverings are required for all Guests (ages 2 and up) in all indoor locations, regardless of vaccination status. This includes upon entering and throughout all indoor attractions and indoor queues and in Disney buses, monorail and Disney Skyliner, regardless of vaccination status. Face coverings are optional for Guests in outdoor areas.

I recommend that you continue checking our 'Know Before You Go' website https://disneyworld.disney.go.com/experience-updates/ for the most up-to-date information regarding the face coverings requirement.

Please know that our face coverings requirement is not in violation of the Americans with Disabilities Act (ADA), which we continue to follow in our accessibility policies. At this time, when individuals do not wear a face covering at the Walt Disney World Resort, it compromises the health and safety of other Guests and our Cast, and the ADA does not require accommodations that pose a direct threat to the safety of others.

We understand that these times are challenging, and we appreciate everyone's cooperation and patience as we navigate as responsibly as we can. We are focused on consistent health and safety measures. I am truly sorry for how this may affect your family's vacation plans. If you have any further questions, I'm traditionally in the office on Sunday, Monday, Wednesday, and Thursday from 9:00 a.m. to 5:00 p.m. ET and can be reached by calling 407-828-1376.

Aaron, thank you for your understanding and we hope you are able to visit the park with your family when these necessary precautions are lifted.

Kind regards,

Jared Fields
Guest Experience Services
Walt Disney World Resort
407–828–1376

## Aaron Abadi

Aug 27, 2021, 3:01 PM EDT

 I have a medical disability, specifically a sensory processing disorder, and I cannot wear a mask or a face shield.
Attached is a copy of the letter from my doctor confirming the above, and attesting to the fact that I already had Covid. I am no longer a health risk.

It is my understanding, that at your parks and facilities you require people to wear a mask currently.
I would like to come to the park with my children, and to be accommodated so that I don't have to wear a mask. CDC guidelines and all state mandates exempt someone like me from wearing a mask when the mandates were in effect. Federal ADA laws require that a person with a disability is accommodated.

Please confirm that if I booked a trip to Disney World or Disneyland, that I will be accommodated appropriately.

Much appreciated,


Aaron Abadi
CEO
National Environmental Group
Cell # 516–639–4100



Attachment(s)
[NYU Langone Health MyChart – Letter re mask.pdf](NYU Langone Health MyChart – Letter re mask.pdf)

# Aaron Abadi

82 Nassau Street Apt 140
New York, NY 10038
516-639-4100

EXHIBIT  H

Appeals Unit
Department of Fair Employment and Housing ("DFEH")
2218 Kausen Drive, Suite 100
Elk Grove, California  95758

February 28, 2022

RE: Notice of Case Closure
Case Number: 202109-14680407
Case Name: Abadi / The Walt Disney Company

Dear Appeals Unit;

I completely disagree with the DFEH findings. I respectfully ask for an appeal. I have attached the initial closure letter of Feb 7 and the final closure notice of February 28.  I also attached my response to the initial closure letter. Here are my main issues with why I believe this was wrongfully dismissed.

1)      The explanation given is "insufficient evidence." That is not the truth at all, if you read the letters sent out.  The email conversation where they denied me access is the evidence. That's not the real reason they denied me.

2)      The real reason they denied me, if you look at the Feb 7 initial notice, you will see it was for two main points:

a.      "Respondent demonstrated an affirmative defense involving the health or safety of an individual with a disability and the health or safety of others. "

     b.     "A review of Respondent's Disability Access Service program reveals evidence that an option to wait in lines virtually was available which would limit the amount of time a face covering is required."

     3)     Regarding 2a, as you will see in my response, ADA and all disability agencies have specific procedures to make a determination of "direct threat." These procedures were not followed at all. You cannot just demonstrate an affirmative defense. There are specific requirements, especially making an individualized assessment, which was clearly not even attempted.

     4)     Regarding 2b, that is just silly.  I attached a map of Disneyland park. Look at all the listed stores, restaurants, and attractions. There are barely any activities outdoors, as over 90% is indoors.  Also, it is not an alternative option to stand on line virtually, because when it is finally my place in line, I anyway cannot go indoors on the ride, as I physically cannot wear a mask.

     It is a shame that my civil rights are not being protected.  We are all suffering from this epidemic.  There is no need to punish the disabled. Please reverse the commission's findings and demand that they stand up for my civil rights.

Respectfully,

*Aaron Abadi*

Aaron Abadi, Complainant



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                            GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                    KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

February 7, 2022

**Via First Class Mail and Email:**
aa@neg.com

Aaron Abadi
82 Nassau St., Apt. 140
New York, NY 10038

RE:    **Closure Determination and Request for Additional Information**
       **Case Number:** 202109-14680407
       **Case Name:** Abadi / The Walt Disney Company

Dear Aaron Abadi:

Your allegations of discrimination against the above-referenced Respondent and/or Co-Respondent(s) have been filed with our Department.

Based on an analysis of the facts and circumstances which you alleged, your complaint will be closed for the following reason: **Insufficient Evidence.** If you disagree with this determination, you may provide more information to substantiate your allegations **within ten (10) calendar days from the date of this letter.** Please provide any new detailed information or evidence (i.e., documents, records, witness information) that support your complaint. Specifically, respond to the statements or questions below.

1. You alleged you were denied service due to your disability. Specifically, you alleged you contacted Respondent because you were hoping to visit Disneyland and you requested an exemption to the mask mandate. You alleged Respondent replied indicating that face coverings are required for all guests (ages 2 and up) in all indoor locations regardless of vaccination status.

2. The Respondent denies the allegation and asserts that, consistent with public health guidance, they adopted a policy that requires all guests to wear a face covering in indoor locations and enclosed transportation vehicles during the pandemic, and this policy was in effect in August and September 2021 when you requested an exemption. The Respondent asserts that they were not required to accommodate you without wearing a face covering because doing so would pose a "direct threat" to the health and safety of the employees and guests.

3. The investigation into this allegation included a review of notes from your intake interview, Respondent's position, your verbal rebuttal, Respondent's face covering policy, Disability Access Service program, and a review of Orange County ordinances, CDC, CDPH, and EEOC guidelines. The evidence reveals that the Respondent demonstrated they were required by local, state, and federal guidelines to take the action they did. The evidence produced supports the

Respondent demonstrated an affirmative defense involving the health or safety of an individual with a disability and the health or safety of others.  A review of Respondent's Disability Access Service program reveals evidence that an option to wait in lines virtually was available which would limit the amount of time a face covering is required.

4. Based on the investigation, there is insufficient evidence to support a violation of the Unruh Civil Rights Act.

The new information that you provide will be carefully considered.  If you do not provide more information which substantiates your allegations on or before **February 17, 2022**, your complaint will be closed, and you may file a private lawsuit.

You can provide the information by telephone, mail or e-mail.  If you choose to mail your response, please include your case number **202109-14680407** and mail it to the **Department of Fair Employment and Housing**, **2218 Kausen Drive, Suite 100**, **Elk Grove**, **CA 95758**.

Thank you for your cooperation.

Sincerely,

Linda G. Connor
Consultant III (Specialist)
661-281-0399 Office
916-214-7567 Cell
888-519-5917 Fax
Email:  linda.connor@dfeh.ca.gov

# Aaron Abadi

82 Nassau Street Apt 140
New York, NY 10038
516-639-4100

Linda Connor, Consultant III (Specialist)
Department of Fair Employment and Housing ("DFEH")
State of California | Business, Consumer Services and Housing Agency
2218 Kausen Drive, Suite 100
Elk Grove, California  95758

February 8, 2022

RE: Closure Determination and Request for Additional Information
Case Number: 202109-14680407
Case Name: Abadi / The Walt Disney Company

Dear Linda,

First, I want to thank you for your work on behalf of those that face discrimination. Additionally, I really appreciate your efforts on my behalf regarding this complaint. You have been kind, helpful, and honest.

As per our conversation yesterday, I completely disagree with the DFEH findings. I believe that your agency needs to do a more thorough review of the relevant laws, as your decision is totally off the mark and contrary to settled law.

In the following paragraphs, I will try to clarify why I disagree and present my case. Based on the arguments below, I will most certainly appeal the DFEH decision if it is not reversed.

Please send me, at your convenience, instructions how to obtain a copy of the answer by Disney, in preparation for an appeal.

The following are my responses to the Disney answer which you presented to me in short, verbally, and to you letter issuing the DFEH determination to close this case due to lack of evidence.

## OFF-SITE DENIAL IS STILL DISCRIMINATION:

Disney claimed in its response that since I was not actually on site when they denied me access, it is not considered discrimination.  I appreciate your response to that, agreeing with me that the evidence shown of the email denying me access due to my disability and inability to wear a mask would be enough to show discrimination.  There's no requirement in the law for the victim of discrimination to only have rights, if he comes on the site, physically, and then is removed or denied access.

A defendant, Target Corporation attempted to use a similar justification as Disney in federal court regarding an ADA discrimination complaint, and the court ruled against it.

"Off-Site Discrimination. The ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added). The statute applies to the services of a place of public accommodation, not services in a place of public accommodation. Id. To limit the ADA to discrimination in the provision of services occurring on the premises of a public accommodation would contradict the plain language of the statute. See id.; see also Rendon, 294 F.3d at 1285' (holding that a process for selecting contestants for a game show that screened out the disabled was actionable under Title III even though the process occurred outside the premises of the public accommodation); Stoutenborough, 59 F.3d at 582-83 (emphasis added) (concluding that Title III covers "all of the services which the public

accommodation offers"); Weyer, 198 F.3d at 1115 (holding that "whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services"). To the extent defendant argues that plaintiffs' claims are not cognizable because they occur away from a "place" of public accommodation, defendant's argument must fail."  National Federation of the Blind v. Target Corp., 452 F. Supp. 2d 946 - Dist. Court, ND California 2006.

Also see Rendon v. Valleycrest Productions, Ltd., 294 F. 3d 1279 - Court of Appeals, 11th Circuit 2002. "To contend that Title III allows discriminatory screening as long as it is off site requires not only misreading the relevant statutory language, but also contradicting numerous judicial opinions that have considered comparable suits dealing with discrimination perpetrated "at a distance." For cases arising under the ADA, see, e.g., Ferguson v. City of Phoenix, 157 F.3d 668 (9th Cir.1998) (hearing-disabled plaintiffs' ADA Title II challenge to 9-1-1 emergency response system that lacked TDD capacity[9]); Bartlett v. N.Y. State Bd. of Law Examiners, 226 F.3d 69 (2d Cir.2000) (dyslexic bar exam taker entitled to reasonable accommodations under Title II of ADA). For cases arising under the Civil Rights Act of 1964, see, e.g., Rousseve v. Shape Spa for Health & Beauty, Inc., 516 F.2d 64 (5th Cir.1975) (finding a violation where plaintiff's application to join health club was rejected on account of race); Smith v. Young Men's Christian Ass'n of Montgomery, Inc., 462 F.2d 634 (5th Cir.1972) (application to summer camp denied on account of race); Stout v. Young Men's Christian Ass'n of Bessemer, Ala., 404 F.2d 687 (5th Cir.1968) (application to join YMCA denied on account of race). None of these cases involved a physical barrier erected at the site of a public accommodation or public entity; rather, as in the present suit, they involve discriminatory screening methods used to deny access to a provided good, service, privilege or advantage.

As is made clear in the above cases, as it is clear in the cases quoted therein, and as simple logic dictates, a person who is told by email, phone or fax that they're not welcome to come to or benefit from a public accommodation due to their disability, is discriminating and is in violation of any laws against discrimination, the same as if they came down in person and got denied access. There's no exclusion or rule written to require a physical site visit in order for the denial to be discrimination. While I acknowledged that the DFEH did deny this claim, I felt the need to respond to it, due to the fact that it was in Disney's response.

**DIRECT THREAT:**

It seems that Respondent, Disney, and the DFEH used as its main determination and justification the fact that Disney decided that I pose a direct threat and therefore, they are entitled to deny me access. The determination was made as a general rule, assuming that all people without masks are a direct threat, period. No risk evaluation and no discussion. That is contrary to the federal laws. There are specific processes in place that were created by Congress, written into law and signed off by the President.  Only Congress with a similar process can modify or cancel those laws.  DFEH and any and all Unites States federal and state agencies on human rights must adhere and protect these federal laws in addition to relevant state laws.  The state laws cannot differ from the federal laws, other than to add restrictions, penalties, and classes.  It cannot subtract.

Respondent is required by law to make an individualized assessment of every particular disabled person's threat level, "to ascertain the nature, duration, and severity of the risk; the probability that the potential injury will actually occur."

This was not done, rather **Respondent made a general rule assuming that all people without masks are a "Direct Threat," and all those with masks are not a direct threat.**  There is no reasonable judgment that relies on current medical knowledge or available objective evidence that would support such a premise.

In the American with Disabilities Act ("ADA") 28 CFR Part 36, it says as follows:

§ 36.208 Direct threat.
(a) This part does not require a public accommodation to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of that public accommodation when that individual poses a direct threat to the health or safety of others.
(b) In determining whether an individual poses a direct threat to the health or safety of others, a public accommodation must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: The nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

The requirement in this statute in order to make such a denial was not followed, and the justification of the discrimination has no basis in law.

## PUBLIC HEALTH GUIDANCE:

Respondent says that it relied on public health guidance to formulate its policy. The DFEH, therefore, accepted their policy as lawful and denied my complaint. You wrote in your closure letter, "The evidence reveals that the Respondent demonstrated they were required by local, state, and federal guidelines to take the action they did."  You then write, "Respondent's face covering policy, Disability Access Service program, and a review of Orange County ordinances,

CDC, CDPH, and EEOC guidelines. The evidence reveals that the Respondent demonstrated they were required by local, state, and federal guidelines to take the action they did." That is far from correct.

If we look into the specific guidance, we will see that these agencies all consider someone like me exempt from the mask requirements, due to my disability. Just repeating that we based our policy on guidance from all these agencies, does not mean the actual policy is based on that guidance. On the contrary, the guidance from each of these agencies completely exempt me from wearing a mask.

All the mentioned agencies consider me exempt, and I am shocked that the DFEH accepted Disney's statement at face value without confirming their claims. Five seconds on google searching for these mandates and you can see that every single one of the mentioned public health guidance agencies say that I am exempt and should be able to go without a mask.

**The <u>CDC</u> Says, "Masks should not be worn by:**

**Child under 2 years of age**

**A person with a disability who cannot wear a mask, or cannot safely wear a mask, for reasons related to the disability."**

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html#mask-adaptations-alternatives

**<u>CDPH (California Dept of Public Health)</u>** says, "Exemptions to masks requirements

The following individuals are exempt from wearing masks at all times:

Persons younger than two years old. Very young children must not wear a mask because of the risk of suffocation.

Persons with a medical condition, mental health condition, or disability that prevents wearing a mask."

https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/guidance-for-face-coverings.aspx

CDPH also says the following in its FAQ section, "Who is exempt from wearing a mask?

The following individuals are exempt from wearing masks at all times:

Persons younger than two years old. Very young children must not wear a mask because of the risk of suffocation.

Persons with a medical condition, mental health condition, or disability that prevents wearing a mask."

https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Face-Coverings-QA.aspx

**<u>Orange County Health Care Agency</u>** states, "The following individuals are exempt from wearing masks at all times:

Persons younger than two years old. Very young children must not wear a mask because of the risk of suffocation.

Persons with a medical condition, mental health condition, or disability that prevents wearing a mask." https://occovid19.ochealthinfo.com/article/oc-health-officers-orders-recommendations#:~:text=The%20following%20individuals%20are%20exempt,that%20prevents%20wearing%20a%20mask.

**The EEOC (U.S. Equal Employment Opportunity Commission)** states, "These facts manifestly support a finding that a significant risk of substantial harm would be posed by having someone with COVID-19, or symptoms of it, present in the workplace at the current time."

As per their guidance, you need to actually have Covid19 or symptoms of it, in order to be determined as a "direct threat, which is defined as a significant risk. Someone without symptoms, and without testing positive for Covid19, would not be labeled a direct threat. I did not have Covid19 nor any of its symptoms, and was not asked about that either.   https://www.eeoc.gov/laws/guidance/pandemic-preparedness-workplace-and-americans-disabilities-act

Every one of these agencies mentioned by Disney as providing their guidance and thus encouraging and/or justifying their discrimination, all say very clearly that I am not a direct risk and I should be allowed to enter everywhere without a mask due to my specific disability. It is difficult to understand how the DFEH allowed such a statement to impair their judgment, without doing their own research of the guidance from these agencies.

If they want to look for guidance, they can check any and all state mandates, federal mandates, and even most foreign countries.  They will find that an exemption in my case is valid almost anywhere. I know, because I have to live with this disability and with the repercussions of these mandates. In the past two years, I only found two mandates for short periods of time that attempted to deny even the disabled.  These were removed very quickly.  They would not have lasted anyway, as they were in violation of federal law.

I had to fly to India about a year ago, with a stopover in Germany. The airlines (Delta & Air France), the TSA, and the Port Authority Police in New York all knew the law and politely allowed me to proceed unmasked.  In Paris at the airport and in Bangalore at the airport, all the authorities were polite and helpful to

me and allowed me to go unmasked, as it is written in their respective laws. I experienced the same on the return.  The people of the world are humane, empathetic, and law-abiding, in most cases.  People don't usually need to be told not to discriminate against the disabled.  It is a real shame that a company like Disney that caters to families, entertainment and enjoyment, and is not afraid to present to the world its opinions on right and wrong, should suddenly be violating basic laws that almost all humanity agrees to.

## IT IS NOT AN ALTERNATIVE OPTION TO WAIT ON LINE VIRTUALLY:

Your closure letter states that Disney provided an alternative option, by having an option to wait on line virtually. I'm sorry to say, but that is just silly. If I wait on line virtually, and then my turn in line comes up, but I cannot go inside, because I cannot wear a mask, how does that help anyone?! Why would I go in line, if I cannot get on the ride?!

Disneyland Park consists of rides, theatres, restaurants, trains, and stores.  I am banned from all these locations. Yes, there are outdoor fireworks, a parade or two, and a few vendors selling ice cream outdoors. How is that even being presented as an alternative option. Everything is indoors.

I cannot wear a mask, so according to Disney, I cannot go indoors at all. I don't see how waiting on line virtually helps me.  Why would I wait on line for a ride if I cannot go on the ride once it is my turn. I am confused.

## I AM NOT LACKING SUFFICIENT EVIDENCE:

The closure letter states as the reason for denying my complaint, as "there is insufficient evidence to support a violation of the Unruh Civil Rights Act." I believe the evidence is sufficient, as the act of discrimination was proven, and

Disney did not deny its actions. Disney agrees that it did not allow me to enter any of its facilities due to my disability. Disney did try to claim that off-site discrimination is not discrimination, but as you admitted, the DFEH would agree that off-site is still discrimination.

The evidence of discrimination is actually sufficient; however, you are relying on the fact that Disney based its policy on the above-mentioned public health agency guidelines, and on the fact that they made an affirmative defense of a direct threat. Based on that, you are approving Disney's right to discriminate.

As I proved herein, these public health agency guidelines actually exempt someone with a disability that cannot wear a mask, from wearing a mask. Additionally, I have shown very clearly from the law itself that Disney inappropriately deemed me as a direct threat. Being that I am not a direct threat as per ADA law, being that Disney was required by law to allow me to access all its facilities, and in light of the fact that I provided evidence that Disney denied me access which they did not deny or refute, I believe there is sufficient evidence. I again ask the DFEH to investigate this discrimination and provide relief to the fullest extent of the law.

**THERE IS SUFFICIENT EVIDENCE TO SUPPORT A VIOLATION OF THE UNRUH CIVIL RIGHTS ACT.**

Being that above I was able to prove herein that the actions of Respondent Disney was in violation of federal ADA laws governing disability discrimination, automatically, that puts them in direct violation of the UNRUH CIVIL RIGHTS ACT ("UNRUH").

In the State of California CIVIL CODE Section 51 (f) (AKA Unruh Civil Rights Act) it says as follows: **"A violation of the right of any individual under**

**the federal Americans with Disabilities Act of 1990 (Public Law 101-336) shall
also constitute a violation of this section."**

As is the case with most states, UNRUH was created to enforce, add to, and
make the ADA even more effective in the state.  The above shows that Disney was
in violation of the ADA and therefore they're automatically in violation of
UNRUH.

## IN CONCLUSION:

I hope you can review the facts presented, and take a closer look at the laws.
Disney is certainly in violation for discriminating against me due to my disability. I
again ask you to please assist me by reversing your previous decision, by moving
this complaint forward, by enjoining Disney from continuing their discrimination,
and by making available any and all relief obtainable by applicable laws.

Thank you for immediate attention to this matter.

Respectfully,

*Aaron Abadi*

Aaron Abadi, Complainant



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

February 28, 2022

**Via First Class Mail and Email:**
aa@neg.com

Aaron Abadi
82 Nassau St., Apt. 140
New York, NY 10038

RE:  **Notice of Case Closure**
     **Case Number**: 202109-14680407
     **Case Name**: Abadi / The Walt Disney Company

Dear Aaron Abadi:

The Department of Fair Employment and Housing (DFEH) has closed your case for the following reason: **Insufficient Evidence**

For housing complaints, California Government Code section 12980, subdivision (h), requires that you be advised of your right to file a civil action against the person named in your complaint.  That right is contained in Government Code section 12989.1.  You must file such an action within two years after the occurrence or the termination of the alleged discriminatory housing practice.  The computation of the two-year period does not include any time during which this complaint was pending with DFEH. If a settlement or conciliation agreement has been signed resolving the complaint, it is likely that your right to file a private lawsuit may have been waived.

Within 10 days of receiving this letter, you may appeal this decision by emailing appeals@dfeh.ca.gov; by calling our Communication Center at 800-884-1684 (voice), 800-700-2320 (TTY) or California's Relay Service at 711; or by writing to:

**Appeals Unit**
**Department of Fair Employment and Housing**
**2218 Kausen Drive, Suite 100**
**Elk Grove, CA 95758**

Your appeal should include a 1) summary as to why you disagree with the reason; and/or, 2) any new detailed information (e.g., documents, records, witness information) that supports your claim.  If you appeal, the information you provide will be carefully considered.

Should you decide to bring a civil action on your own behalf in court in the State of California under the provisions of the California Fair Employment and Housing Act (FEHA) against the person, employer, labor organization or employment agency named in your complaint, below are resources for this.  Please note that if a settlement agreement has been signed resolving the complaint, you might have waived the right to file a private lawsuit.

<u>**Finding an Attorney**</u>
To proceed in Superior Court, you should contact an attorney.  If you do not already have an attorney, the organizations listed below may be able to assist you:

Notice of Case Closure
February 28, 2022

- The State Bar of California has a Lawyer Referral Services Program which can be accessed through its Web site at www.calbar.ca.gov or by calling (866) 442-2529 (within California) or (415) 538-2250 (outside California).

- Your county may have a lawyer referral service.  Check the Yellow Pages of your telephone book under "Attorneys."

**<u>Filing in Small Claims Court</u>**
- The Department of Consumer Affairs (DCA) has a publication titled "The Small Claims Court: A Guide to Its Practical Use" online at of "The Small Claims Court: A Guide to Its Practical Use" online at http://www.dca.ca.gov/publications/small_claims.  You may also order a free copy of "The Small Claims Court: A Guide to Its Practical Use" online, by calling the DCA Publication Hotline at (866) 320-8652, or by writing to them at: DCA, Office of Publications, Design and Editing; 1625 North Market Blvd., Suite N-112; Sacramento; CA; 95834.

- The State Bar of California has information on "Using the Small Claims Court" under the "Public Services" section of its Web site located at www.calbar.ca.gov.

Sincerely,

*Linda D. Connor*

Linda G. Connor
Consultant III (Specialist)
661-281-0399 Office
916-214-7567 Cell
888-519-5917 Fax
Email:  linda.connor@dfeh.ca.gov

Cc:    The Walt Disney Company
       500 S Buena Vista Street
       Burbank, CA 91521
       c/o Kerry Alan Scanlon
       via email to: kscanlon@mwe.com

# Disney Magic you won't want to miss!

See Times Guide for days and times.



### Star Tours - The Adventures Continue
Tomorrowland
Make the jump to hyperspace during this 3D, motion-simulated flight—with visits to legendary locations from the films!



### Star Wars Launch Bay
Tomorrowland
Encounter your favorite characters in iconic Star Wars' environments—plus view film props, screen videos and more!



### Pirates of the Caribbean
New Orleans Square
Celebrate 50 years of swashbuckling as you set sail on a voyage to a long-forgotten time, when pirates wrought havoc on the high seas.



### Fantasy Faire
Fantasyland
Visit with Disney Princesses at Royal Hall, attend live shows, shop, snack and revel in pure fairytale enchantment!



### Big Thunder Mountain Railroad
Frontierland
Dash in and out of craggy caverns and rumble through an old mine aboard a speeding train!



### Fantasmic!
Frontierland
In Mickey's dream, witness the forces of good and evil battling bigger and better than ever before—thanks to enhanced special effects and jaw-dropping entertainment during this musical, pyrotechnic spectacular!



Separate park admission required

### Guardians of the Galaxy – Mission: BREAKOUT!
Hollywood Land
Join Rocket on a thrilling mission to rescue the Guardians of the Galaxy from high up in The Collector's fortress!

---



## Disney MaxPass

**A NEW service that gives you digital access to Disney FASTPASS® selections and more!**

Reserve digital **Disney FASTPASS®** selections right from your mobile device* while in the Parks.

— AND —

Download unlimited *Disney PhotoPass®* photos** for a day.

With the NEW *Disney MaxPass* service, you can do both for only $10 per day, per ticket!

**Visit Disneyland.com/Maps to download the *Disneyland®* App*** and purchase the *Disney MaxPass* service today!**

*Disneyland* RESORT

*Guests are strongly advised to check the day's FASTPASS® entitlement availability and other Park details before purchasing. Disney MaxPass as your preferred attractions may not be available at the time of purchase. FASTPASS® entitlements are limited and availability is not guaranteed. FASTPASS® entitlements for entertainment are not available through Disney MaxPass. Disney MaxPass is nonrefundable and is subject to restrictions and change without notice.
**Disney PhotoPass Service is subject to the PhotoPass terms and conditions policy found at https://disneyland.disney.go.com/photopass-terms-conditions/. Online registration required. PhotoPass photos captured during the day your Disney MaxPass is used must be linked to your Disney account. Subject to restrictions and change without notice.
***Message, data and roaming rates may apply. Availability subject to handset limitations and features may vary by handset or service provider. Coverage not available everywhere. If you're under 18, get your parents' permission first. ©Disney DLR 19-4129Y

---



# GUIDEMAP

## Disneyland Park





Enhance your Disneyland Resort visit! Get the Disneyland app at disneyland.com/maps.

Chat with us! @DisneylandToday | Facebook.com/DisneylandToday

---

## Park rules

Please comply with park rules, signs and instructions, including:
- All bags are subject to inspection prior to admission
- Proper attire is required
- Smoking is allowed only in designated areas
- Weapons are strictly prohibited

Additional details and a complete listing of park rules are available at Guest Relations or Disneyland.com/ParkRules

## Special considerations for attractions

**SAFETY:** Please abide by all safety warnings and notices.

Supervise children at all times. Children under age 7 years must be accompanied by a person age 14 years or older.

For your safety while on attractions, remain seated with hands, arms, feet and legs inside the vehicle. Supervise children.

**Physical considerations on designated attractions:**

**WARNING!** For your safety, you should be in good health and free from high blood pressure, heart, back or neck problems, motion sickness, or other conditions that could be aggravated by this adventure. Expectant mothers should not ride.

## Maximize your time with Disney MaxPass!

1 Reserve digital Disney FASTPASS® selections right from your mobile device while in the parks.

2 Download unlimited Disney PhotoPass® photos for a day.

Download the Disneyland app at Disneyland.com/maps to get details and purchase Disney MaxPass.

FastPass selections are limited and availability is not guaranteed. Disney MaxPass is nonrefundable. Message, data and roaming rates may apply for app usage, and availability and features may vary and are subject to limitations. Coverage not available everywhere. If you are under 18, get your parents' permission first.

## Cut the wait time in 3 easy steps!

**Enjoy popular attractions with minimal wait.**

1 Insert your park ticket or Annual Passport into the FASTPASS® machine and you'll receive a FASTPASS® reminder ticket as a receipt.

2 If you have purchased Disney MaxPass service, you can reserve digital Disney FASTPASS® from your mobile device.

3 Come back during your return time and scan the same park ticket or Annual Passport.

## Capturing the magic is as easy as 1-2-3! PhotoPass

1 Smile for PhotoPass photographers found around the Parks or while onboard select attractions.

2 Link and preview photos in the Disneyland app by entering the:
- ID found on the back of your Disney PhotoPass® card
- 8-character ID found on the monitors at the photo preview wall of attraction exits.

3 Purchase photo downloads at DisneyPhotoPass.com or buy Disney MaxPass for unlimited downloads for the day.

*Photos available online for 45 days. Online registration required. Disney MaxPass is nonrefundable.

---





**Smoking** For the comfort of all our Guests, smoking is allowed in designated areas only. At Disneyland the smoking location can be found on Big Thunder Trail in Frontierland.



**Mickey Check** Look for this symbol at various locations on kids' meals and other items that meet Disney Nutrition Guidelines. Visit www.disneymickeycheck.com for more information.



**Be Green!** Recycling containers throughout the parks now accept plastic, paper, cans & glass.

**Package Check Service** Shop and check your purchases for pickup later in the day at these locations: Stroller Shop (Main Entrance), The Star Trader (Tomorrowland) or Pioneer Mercantile (Frontierland). Resort Hotel Guests may have purchases delivered to Bell Services for next-day pickup after 7 a.m. Certain restrictions apply.



**Resort Lost and Found** Inquire at Resort Lost and Found, located west of the *Disneyland®* Park Main Entrance.

**Lost Guests** Guests under the age of 14 are escorted to Lost Children at the Baby Care Center. Guests 14 years of age and over may leave a written message at City Hall.

**Services for Guests with Disabilities** A guide for Guests with Disabilities is available at Information Centers on the map). For more information about available services, visit City Hall in *Disneyland®* Park.

**Sundries** Available at Emporium on Main Street, U.S.A.



*Disneyland* ALEXA CAMARILLO, CA

Any time you see someone with a Disney nametag, just ask! They're happy to answer your questions.

---

**Strollers** Rentals are available in limited quantities. Please take all personal belongings with you when leaving your stroller unattended.

**Wheelchairs** A limited number is available and Electric Conveyance Vehicles are available to rent. Rental fee and refundable deposit required. Guests must be at least 18 years of age to rent or operate an Electric Conveyance Vehicle.

*Disneyland®* **Kennel Club** Located east of the *Disneyland®* Park Main Entrance. No overnight facilities.

**Charging Lockers** Rental available to secure and charge many personal electronic devices.

**Pre-Charged Battery Kiosk** Guests have the opportunity to swap or purchase a pre-charged portable battery and connecting cords for their mobile device.

**Payment Options** The *Disneyland®* Resort accepts Disney® Visa® Cards, Disney Rewards Redemption Card, Disney Gift Card, Visa®, MasterCard®, Discover®, American Express®, Diners Club®, JCB®, traveler's checks, cash and Disney Dollars.

**Travel Tips** Should your vehicle become disabled during your visit, the Automobile Club of Southern California provides complimentary towing and flat-tire services to nonmembers during park hours.



Use the *Disney Gift Card* instead of carrying cash. It's easy and can be used throughout the resort. Start with any amount from $15 to $1,000, and reload it at any time. Available for purchase throughout the resort. Visit DisneyGiftCard.com for terms.

**Disney Pins** At 20th Century Music Company, Westward Ho Trading Company, and Little Green Men Store Command
Information subject to change without notice.

---

## Here are 4 good ways to safer days!



1 **No stampeding** (Don't run)

2 **Keep your arms, hooves, tusks and tails inside ride vehicles** (and your hands, feet and legs)

3 **On rides, stay seated with your tail down** (You get this one, right?)

4 **Keep your paws behind the yellow line** (Don't cross the yellow safety lines at attractions)

# Main Street, U.S.A.

## ATTRACTIONS

1 *Disneyland* Railroad
Main Street Vehicles
(One-way transportation only)
2 Horseless Carriage
3 Fire Engine
4 Horse-Drawn Streetcars
5 Omnibus
Opera House
6 Disney Gallery
7 The *Disneyland* Story presenting Great Moments with Mr. Lincoln
8 Main Street Cinema

## DISNEY DINING

A Carnation Café Table service – breakfast, fried pickles, burgers, salads, entrées, and sundaes.
B Gibson Girl Ice Cream Parlor hosted by Dreyer's®.
C Refreshment Corner hosted by Coca-Cola®. Hot dogs, chili and cold Coke.
D Market House Starbucks® Espresso and Specialty Beverages, Artisan breakfast sandwiches and pastries.
E Plaza Inn "Minnie & Friends – Breakfast in the Park," Lunch and dinner featuring homestyle favorites.
F Jolly Holiday Bakery Café Baked goods, sandwiches, salads and specialty drinks.

# Adventureland

## ATTRACTIONS

9 Enchanted Tiki Room presented by Dole Packaged Foods. (Continuous show)
10 Jungle Cruise
11 Indiana Jones™ Adventure (Minimum height 46"/117 cm)
12 Tarzan's Treehouse™

## DISNEY DINING

G Tiki Juice Bar hosted by Dole Packaged Foods.
H Aladdin's Oasis
I Bengal Barbecue Barbecue kabobs and coffee drinks.

# New Orleans Square

## ATTRACTIONS

13 Pirates of the Caribbean
14 *Disneyland* Railroad
15 Haunted Mansion

## DISNEY DINING

J Royal Street Veranda Chowder and gumbo in bread boules and New Orleans style fritters.
K Blue Bayou Restaurant Table-service – seafood, chicken and beef dinners, plus the famous Monte Cristo sandwich at lunch.
L Café Orléans Table service – lunch and dinner, soups, salads, and Monte Cristo sandwiches.
M French Market Restaurant French quarter chicken, jambalaya, Cajun meatloaf, French dip, hand tossed salads and desserts.

# Critter Country

## ATTRACTIONS

16 Splash Mountain (Minimum height 40"/102 cm)
17 The Many Adventures of Winnie the Pooh
18 Davy Crockett's Explorer Canoes (Operates weekends and select seasons only)

## DISNEY DINING

N Harbour Galley Soup in bread boules, lobster rolls, salads, and drinks.
O Hungry Bear Restaurant Burgers, chicken and salads.

# Frontierland

## ATTRACTIONS

19 Pirates Lair on Tom Sawyer Island
20 Fantasmic! (See Times Guide for show times)
21 The Golden Horseshoe Stage (See Times Guide for show times)
22 Frontierland Shootin' Exposition
23 Mark Twain Riverboat
24 Sailing Ship Columbia (Operates weekends and select seasons only)
25 Big Thunder Mountain Railroad (Minimum height 40"/102 cm)

## DISNEY DINING

P River Belle Terrace Table service – BBQ Ribs, salads, sandwiches and desserts.
Q Stage Door Café Corn dogs, fish and chips, and chicken nuggets.
R The Golden Horseshoe Chicken nuggets, chili, fish and chips, and tasty ice cream specialties.
S Rancho del Zocalo Restaurante Breakfast, salads, tacos, burritos and Costena Grill specialties.
T Ship to Shore Marketplace Fresh fruit, turkey legs, chimichangas, and frozen beverages.

# Fantasyland

## ATTRACTIONS

Fantasy Faire
26 Royal Hall
27 Royal Theatre (See Times Guide for show times)
28 Pinocchio's Daring Journey
29 Snow White's Scary Adventures

## DISNEY DINING

Bibbidi Bobbidi Boutique
Sleeping Beauty Castle Walkthrough (Alternate experience)
30 King Arthur Carrousel
31 Casey Jr. Circus Train
32 Dumbo the Flying Elephant
33 Mr. Toad's Wild Ride
34 Peter Pan's Flight
35 Mad Tea Party
36 Alice in Wonderland
37 Pixie Hollow
38 Matterhorn Bobsleds (Minimum height 42"/107 cm)

41 Storybook Land Canal Boats (Closed during parades)
42 "it's a small world" (Disney FASTPASS® distribution at Matterhorn Bobsled's Disney FASTPASS® distribution location.)
43 Fantasyland Theatre (See Times Guide for days and times)

## DISNEY DINING

U Maurice's Treats Sweet and savory twists, and Boysen Apple Freezes.
V Red Rose Taverne (Limited Time) hosted by Minute Maid®. Burgers, flatbread pizza and veggie options.

W Troubadour Tavern hosted by Dreyer's®. Bratwurst, pretzel bites, cinnamon apple batons, baked potatoes, and ice cream novelties.

X Edelweiss Snacks Turkey legs, corn on the cob, chimichangas and frozen beverages.

*Select Fantasyland attractions may close early due to fireworks. Please visit an Information Center for operating hours.

# Mickey's Toontown

## DISNEY DINING

Y Toontown Dining Hot dogs, salads, sandwiches, pizza, frozen yogurt and ice cream treats.

Mickey's Toontown may close early due to fireworks. Please visit an Information Center for operating hours.

# Tomorrowland

## ATTRACTIONS

44 *Disneyland* Railroad
45 Goofy's Playhouse
46 Donald's Boat
47 Gadget's Go Coaster (Minimum height 35"/89 cm; expectant mothers should not ride)
48 Chip 'n Dale Treehouse
49 Mickey's House and Meet Mickey
50 Minnie's House
51 Roger Rabbit's Car Toon Spin

## ATTRACTIONS

52 Finding Nemo Submarine Voyage
53 *Disneyland* Monorail (Alternate experience)
54 Autopia powered by Honda. (Minimum height 32"/81 cm and 54"/132 cm to drive alone)
55 *Disneyland* Railroad
56 Star Wars Launch Bay
57 Space Mountain (Minimum height 40"/102 cm)
58 Tomorrowland Theater
59 Star Tours — The Adventures Continue (Minimum height 40"/102 cm)
60 Astro Orbitor
61 Buzz Lightyear Astro Blasters

## DISNEY DINING

Z Galactic Grill Breakfast, sandwiches, burgers, salads, desserts and drinks from Galaxies Far, Far Away...
AA The Spirit of Refreshment hosted by Coca-Cola®.
BB Redd Rockett's Pizza Port Pizza, pasta and salads.

# Critter Country
# New Orleans Square
# RIVERS OF AMERICA
# Frontierland
# Fantasyland
# Main Street, U.S.A.
# Adventureland
# Tomorrowland
# Mickey's Toontown







# Fantasmic! Viewing Options*

Show Ticket Distribution
Available along the Rivers of America adjacent to Frontier Landing.

Blue Bayou and River Belle Terrace
Dinner packages include a ticket for access to reserved viewing. Make reservations at Disneyland.com, 714-781-DINE (3463) or by stopping by the restaurant.

Hungry Bear Restaurant
On-the-Go meals include a ticket for access to the viewing area. Make reservations at Disneyland.com, 714-781-DINE (3463) or by stopping by the restaurant.

Non-ticketed Viewing
Available for each performance along the Rivers of America on a first come, first serve basis.

*Show Tickets and dining packages are limited.

Tram to Mickey & Friends Parking
Taxis available next to ESPN Zone
Downtown Disney District and Hotels of the Disneyland Resort
Shuttle buses to Buzz, Woody & Jessie Lots
Shuttle buses to satellite parking lots

*Attraction operating hours may vary from park hours. Please see location or Information Centers for more information. Entertainment may vary and is subject to change. Please see Times Guide for days and times.

## Guest Services (right column legend)

Restrooms
Companion Restroom
Automated External Defibrillators
Resort Lost and Found
Information Center Guest Relations
First Aid
Wi-Fi Hotspot
ATMs Presented by Chase
Baby Care Center hosted by Huggies®
Stroller Rentals hosted by Huggies®
Locker Rentals
Charging Locker Rentals
Pre-charged Battery Kiosk
Picnic Area
Wheelchair Rentals
Package Check Service
Service Animal Relief Area
Kennel
Nikon® Picture Spot
Disney FASTPASS® Service (Subject to availability)
Single Rider Service (Subject to availability)
Height Requirement
Guest May Remain in Wheelchair/ECV
Guest Must be Ambulatory
Guest Must Transfer from Wheelchair/ECV
Guest Must Transfer from ECV to Wheelchair
Physical Considerations (See reverse side)
The seating and restraints of this attraction may prohibit Guests of certain body shapes or sizes from riding
This attraction may be frightening for children
Reflective Captioning
Audio Description: Device Available at Guest Relations
Handheld Captioning: Device Available at Guest Relations
Assistive Listening: Device Available at Guest Relations
Closed Captioning: Activation Available at Guest Relations and location
Sign Language on Mon. & Sat. Schedule and Times Guides at Guest Relations
Smoking Area
Reservations Accepted
Parade Route
Disney Vacation Club® Kiosk
Disney Characters See Times Guide for hours

*Emergency services available by calling 911.

©Disney ©Disney/Pixar ©MARVEL
Tarzan's Treehouse™ TARZAN™ Owned by Edgar Rice Burroughs, Inc. and used by Permission. COPYRIGHT ©1999 Edgar Rice Burroughs, Inc. and Disney Enterprises, Inc. All Rights Reserved. Roger Rabbit Character ©Disney/Amblin Entertainment, Inc. Finding Nemo Submarine Voyage is inspired by Disney•Pixar's Finding Nemo. Indiana Jones™ Adventure and Star Tours: The Adventures Continue ©Disney/Lucasfilm Ltd. & ™ Lucasfilm Ltd. Buzz Lightyear Astro Blasters is inspired by Disney•Pixar's Toy Story 2. Attractions and entertainment may be seasonal and are subject to change without notice. Jack Skellington is inspired by Tim Burton's The Nightmare Before Christmas.

# FLORIDA FIRST DISTRICT
# COURT OF APPEALS

EXHIBIT  I

| | |
|---|---|
| AARON ABADI, | |
|      Appellant/Petitioner, | CASE # 1D21-3749 |
| v. | |
| WALT DISNEY WORLD | |
| PARKS & RESORTS. | |
|      Appellee/Respondent. | |

LOWER TRIBUNAL:

FLORIDA COMMISSION ON HUMAN RELATIONS

Petition to review lower tribunal final action dismissing discrimination complaint

# **INITIAL BRIEF**

December 24, 2021

Aaron Abadi, Petitioner
82 Nassau Street Apt 140
New York, NY 10038
Email: aa@neg.com

# **TABLE OF CONTENTS**

Page

- Cover…………………………………………………….1

- Table of Contents………………………………………..2

- Table of Citations………………………………………..3

- Jurisdiction………………………………………………4

- Statement of the Case & Facts……………………….....4

- Argument Summary……………………………………….. 9

- Argument…………………………………………………..10

- Conclusion…………………………………………………13

- Certificate of Service……………………………………13

- Certificate of Compliance………………………………...14

# <u>TABLE OF CITATIONS</u>

Page

Florida Administrative Code, Rule 60Y-4.031 ………………..…..…..4

Florida Rules of Appellate Procedure 9.030 b.1(C)…………………..4

Florida Statutes 120.68…………………………………………………..4

Florida Statute 760.08…………………………………………………..9, 10

National Federation of the Blind v. Target Corp.,

      Dist. Court, ND California 2006……………………………..10, 12

Rendon v. Valleycrest Productions, Ltd., 294 F. 3d 1279 –

      Court of Appeals, 11th Circuit 2002……………………………..12

# JURISDICTION

1.      A District Court of Appeals is the appropriate jurisdiction for a review of an administrative action in Florida. The Florida Rules of Appellate Procedure 9.030 b.1(C) states that "District courts of appeal shall review, by appeal… administrative action if provided by general law."

2.      The First District Court of Appeals is the correct venue, as the FCHR maintains its headquarters in Tallahassee, Florida. Florida Statutes 120.68 (1)(a) "A party who is adversely affected by final agency action is entitled to judicial review. (2)(a) Judicial review shall be sought in the appellate district where the agency maintains its headquarters…"

# STATEMENT OF THE CASE & FACTS

3.      Pursuant to Rule 60Y-4.031, Florida Administrative Code, Appellant hereby seeks judicial review of the decision by the Florida Commission on Human Relations ("FCHR") (See appendix page 4) to dismiss my complaint that I filed with them against Walt Disney World Parks & Resorts ("Disney").

4.      On August 27, 2021 I wrote an email to Disney (See appendix page 5), as I was planning to go to Disney World Resorts in Florida and stay at their

hotels and go to the various Parks, Stores, restaurants, and so on. I was hoping to go in the end of September or early October with my children and grandchildren. We have been going there almost every year for decades, and unfortunately, since Covid hit, we have not been able to go.

5.      In this email I explained that I have a sensory processing disorder and cannot wear a mask. I notified them in advance by emailing the following. "I have a medical disability, specifically a sensory processing disorder, and I cannot wear a mask or a face shield. Attached is a copy of the letter from my doctor confirming the above, and attesting to the fact that I already had Covid. I am no longer a health risk. It is my understanding, that at your parks and facilities you require people to wear a mask currently. I would like to come to the park with my children, and to be accommodated so that I don't have to wear a mask. CDC guidelines and all state mandates exempt someone like me from wearing a mask when the mandates were in effect. Federal ADA laws require that a person with a disability is accommodated. Please confirm that if I booked a trip to Disney World or Disneyland, that I will be accommodated appropriately. Much appreciated, Aaron Abadi."

6.      I am almost no risk at all, as I have already had Covid in October as the Doctor attest to in the attached letter that was the letter that I sent to Disney (See appendix page 11). The CDC says that "Covid reinfection is rare." (See

appendix page 12)  The criteria required to be allowed to deny access due to a disability, is if there is a "direct threat," determined from an individual evaluation of the specific disabled person as per ADA laws. I would not have met such a criteria.

7.      They refused to allow me to stay or play at their hotels, resorts, parks, and entertainment properties.

8.      They Responded as follows: "Face coverings are required for all Guests (ages 2 and up) in all indoor locations, regardless of vaccination status. This includes upon entering and throughout all indoor attractions and indoor queues and in Disney buses, monorail and Disney Skyliner, regardless of vaccination status. Face coverings are optional for Guests in outdoor areas. I recommend that you continue checking our 'Know Before You Go' website https://disneyworld.disney.go.com/experience-updates/ for the most up-to-date information regarding the face coverings requirement. Please know that our face coverings requirement is not in violation of the Americans with Disabilities Act (ADA), which we continue to follow in our accessibility policies. At this time, when individuals do not wear a face covering at the Walt Disney World Resort, it compromises the health and safety of other Guests and our Cast, and the ADA does not require accommodations that pose a direct threat to the safety of others. We understand that these times are challenging, and we appreciate everyone's

cooperation and patience as we navigate as responsibly as we can. We are focused on consistent health and safety measures. I am truly sorry for how this may affect your family's vacation plans. If you have any further questions, I'm traditionally in the office on Sunday, Monday, Wednesday, and Thursday from 9:00 a.m. to 5:00 p.m. ET and can be reached by calling 407-828-1376. Aaron, thank you for your understanding and we hope you are able to visit the park with your family when these necessary precautions are lifted. Kind Regards, Jared Fields Guest Experience Services, Walt Disney World Resort, 407-828-1376."

9.      To me this felt like gaslighting, as it is very clear that I am not a "Direct Risk," as I already had Covid, and the CDC says, "Covid reinfections are rare."

10.     Additionally, ADA meaning of direct threat would not apply to masks for Covid, as the protection of a typical mask from Covid is negligible, as proven in multiple studies, and without any evidence of me having Covid, they cannot label me as a Direct Threat.

11.     I should be entitled to live and move around like other people.  State & Federal Law requires them to exempt me from a mask and accommodate me. I was discriminated against due to my disability, and my entire family had to suffer.

12.    As I read the response from Disney, I understood very clearly that I was not permitted to come to Disney without wearing a mask, and since I cannot wear a mask due to my disability. I cannot see any other way to read that response.

13.    Other families can all go to Disney.  I cannot go with my family due to my disability. That, to me, is a classic case of disability discrimination.

14.    I filed a complaint with the FCHR, and on October 5, 2021, John Scotese, attorney for FCHR, responded (See appendix page 7) that they could not proceed with an investigation, because "the complaint is unclear with regard to whether discrimination had occurred. You did not visit the public accommodation, so it is unclear how you were denied services."

15.    In the letter, he suggested that I speak to Mary Smith to amend the complaint.  I called her, and she said, "no, that's just a form letter, I cannot help you.  I see that you sent the lawyer an email, so wait to see if he responds."

16.    My response to the lawyer was as follows: "I asked Disney if I can come and stay at their hotels and play at their parks, even though I cannot wear a mask because of a disability. They responded that even though I had a disability, I would have to wear a mask and there would be no exemption. They are saying very clearly that If I come, I will not be allowed in. I think that is pretty clearly denying me access to the facility. Do I really need to go there and then get thrown out? (See appendix page 8)

17.     I sent a few emails to the lawyer, but they were all ignored.  I guess that I must be less of a human and not worth his time.

18.     On November 23, 2021, I was sent the Notice of Dismissal, dismissing the case, stating, "The Commission previously notified you that the information contained within your complaint was insufficient for the Commission to begin its investigation."

19.     My first reaction was, "Am I on candid camera?!" This just cannot be real. An attorney whose entire responsibility is to help people with disabilities protect their civil rights, is gaslighting me and dismissing my complaint for the most ridiculous reason?! It's just very hard to believe.

20.     I asked Disney if I can come without a mask due to my disability. They said no, you cannot. Everyone else can come. Why is this so complicated?!

## SUMMARY OF ARGUMENT

21.     The Florida Statute reads very clearly, 760.08 "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this chapter, without discrimination or segregation on the ground of race, color, national origin, sex, handicap, familial status, or religion."

22.    I am a person, I was denied the equal enjoyment of goods, services, facilities, privileges, advantages, and accommodations from Disney. I don't know what more can be required.

23.    National Federation of the Blind v. Target Corp., 452 F. Supp. 2d 946 - Dist. Court, ND California 2006. Shows that off-site discrimination is still discrimination.

## ARGUMENT

24.    The Florida Statute reads very clearly, 760.08  "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this chapter, without discrimination or segregation on the ground of race, color, national origin, sex, handicap, familial status, or religion."

25.    I am a person, I was denied the equal enjoyment of goods, services, facilities, privileges, advantages, and accommodations from Disney. I don't know what more can be required.

26.    Discrimination happens all the time by phone, by email, by social media. There's no statute or requirement that a person must be there in person in order to be considered discrimination.

27.     If the attorney would have had the decency to respond to my emails or call me on the phone, maybe this could have been resolved.

28.     My main argument is that the premise that I had to be there at Disney and then get thrown out is preposterous, and has no basis in law.

29.     Discrimination is when someone is not treated equally. Disney should be required to treat me equal to someone else without a disability.  They did not. They said that I could not come because of my disability.

30.     A defendant, Target Corporation attempted to use a similar justification as the FCHR in federal court regarding an ADA discrimination complaint, and the court ruled against it.

31.     "Off-Site Discrimination. The ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added). The statute applies to the services of a place of public accommodation, not services in a place of public accommodation. Id. To limit the ADA to discrimination in the provision of services occurring on the premises of a public accommodation would contradict the plain language of the statute. See id.; see also Rendon, 294 F.3d at 1285' (holding that a process for selecting contestants for a game show that screened out the disabled was actionable under Title III even though the process occurred outside the premises of the public accommodation); Stoutenborough, 59 F.3d at 582-83 (emphasis added) (concluding that Title III covers "all of the services which the public accommodation offers"); Weyer, 198 F.3d at 1115 (holding that "whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services"). To the extent defendant argues that plaintiffs' claims are not cognizable because they occur away from a "place" of public accommodation, defendant's argument must fail." **National Federation of the Blind v. Target Corp.**, 452 F. Supp. 2d 946 - Dist. Court, ND California 2006.

32.     Also see **Rendon v. Valleycrest Productions**, Ltd., 294 F. 3d 1279 -
Court of Appeals, 11th Circuit 2002. "To contend that Title III allows
discriminatory screening as long as it is off site requires not only misreading the
relevant statutory language, but also contradicting numerous judicial opinions that
have considered comparable suits dealing with discrimination perpetrated "at a
distance." For cases arising under the ADA, see, e.g., Ferguson v. City of Phoenix,
157 F.3d 668 (9th Cir.1998) (hearing-disabled plaintiffs' ADA Title II challenge to
9-1-1 emergency response system that lacked TDD capacity[9]); Bartlett v. N.Y.
State Bd. of Law Examiners, 226 F.3d 69 (2d Cir.2000) (dyslexic bar exam taker
entitled to reasonable accommodations under Title II of ADA). For cases arising
under the Civil Rights Act of 1964, see, e.g., Rousseve v. Shape Spa for Health &
Beauty, Inc., 516 F.2d 64 (5th Cir.1975) (finding a violation where plaintiff's
application to join health club was rejected on account of race); Smith v. Young
Men's Christian Ass'n of Montgomery, Inc., 462 F.2d 634 (5th Cir.1972)
(application to summer camp denied on account of race); Stout v. Young Men's
Christian Ass'n of Bessemer, Ala., 404 F.2d 687 (5th Cir.1968) (application to join
YMCA denied on account of race). None of these cases involved a physical barrier
erected at the site of a public accommodation or public entity; rather, as in the
present suit, they involve discriminatory screening methods used to deny access to
a provided good, service, privilege or advantage.

33.     As is made clear in the above cases, as it is clear in the cases quoted

therein, and as simple logic dictates, a person who is told by email, phone or fax

that they're not welcome to come to or benefit from a public accommodation due

to their disability, is discriminating and is in violation of any laws against

discrimination, the same as if they came down in person and got denied access.

There's no exclusion or rule written to require a physical site visit in order for the

denial to be discrimination.

34.     It is a sad state of affairs when the very people entrusted to protect the

disabled from discrimination can present such a farfetched idea, not communicate

properly with the victim of the discrimination, and totally wash their hands from

his situation.

## **<u>CONCLUSION</u>**

Wherefore, Appellant requests from this Court to overturn the FCHR

decision to dismiss this case, and to instruct them to pursue this case of

discrimination as is its duty.

Respectfully submitted this 24th of December, 2021,

s/AARON ABADI
Aaron Abadi
82 Nassau Street Apt 140
New York, NY 10038
Tel: 516-639-4100
Email: aa@neg.com


**CERTIFICATE OF SERVICE**

This Brief has been filed electronically, and automatically served upon the

following:

Cheyanne Costilla, Executive Director,
Florida Commission on Human Relations
4075 Esplanade Way, Room 110, Tallahassee, Florida 32399-7020
Tel: (850) 488-7082  Email: fchrinfo@fchr.myflorida.com

John Scotese, Senior Attorney, Florida Commission on Human Relations
4075 Esplanade Way, Room 110, Tallahassee, Florida 32399-7020

Tel: (850)-907-6823   Email: John.Scotese@fchr.myflorida.

Margaret C. Giacalone
Chief Counsel
WDW Legal, Walt Disney World Resort
PO Box 10 000   Lake Buena Vista, FL 32830-1000
Phone: 407-828-3386   Email: Margaret.c.Giacalone@disney.com

/s/ <u>Aaron Abadi</u>
Aaron Abadi
82 Nassau Street Apt 140
New York, NY 10038
Tel: 516-639-4100
Email: aa@neg.com


## **<u>CERTIFICATE OF COMPLIANCE</u>**

This brief is in compliance with Rule 9.210 (a) (2), as it is typed in Times New

Roman 14-point font.


/s/ <u>Aaron Abadi</u>
Aaron Abadi
82 Nassau Street Apt 140
New York, NY 10038
Tel: 516-639-4100
Email: aa@neg.com

# FLORIDA FIRST DISTRICT
# COURT OF APPEALS

AARON ABADI,

      Appellant/Petitioner,

v.

                        CASE # 1D21-3749

WALT DISNEY WORLD

PARKS & RESORTS.

      Appellee/Respondent.

LOWER TRIBUNAL:

FLORIDA COMMISSION ON HUMAN RELATIONS

Petition to review lower tribunal final action dismissing discrimination complaint

# **APPENDIX**

December 24, 2021

Aaron Abadi, Petitioner
82 Nassau Street Apt 140
New York, NY 10038
Email: aa@neg.com

TABLE OF CONTENTS

Page

Cover …………………………………………………………………...1

Index…………………………………………………………………2

Certificate of service…………………………………………………3

Order to be Reviewed – FCHR Notice of Dismissal……..…………….4

Email from Disney………………………………………………….....5

Letter from John Scotese……………………………………………7

My emails to FCHR & John Scotese………………………………....8

Doctor's Letter………………………………………………………11

CDC – Covid Reinfection is Rare……………………………………..12

## **Certificate of Service**

I hereby certify that this Appendix to the Initial Brief has been filed electronically,

and automatically served the following:

Cheyanne Costilla, Executive Director,
Florida Commission on Human Relations
4075 Esplanade Way, Room 110, Tallahassee, Florida 32399-7020
Tel: (850) 488-7082  Email: fchrinfo@fchr.myflorida.com

John Scotese, Senior Attorney, Florida Commission on Human Relations
4075 Esplanade Way, Room 110, Tallahassee, Florida 32399-7020
Tel: (850)-907-6823   Email: John.Scotese@fchr.myflorida.

Margaret C. Giacalone
Chief Counsel
WDW Legal, Walt Disney World Resort
PO Box 10 000   Lake Buena Vista, FL 32830-1000
Phone: 407-828-3386   Email: Margaret.c.Giacalone@disney.com

/s/ Aaron Abadi
Aaron Abadi
82 Nassau Street Apt 140
New York, NY 10038
Tel: 516-639-4100
Email: aa@neg.com



*State of Florida*
# Florida Commission on Human Relations

*An Equal Opportunity Employer • Affirmative Action Employer*

4075 Esplanade Way • Room 110 • Tallahassee, Florida 32399-7020
(850) 488-7082 / FAX : (850) 487-1007
http://fchr.state.fl.us
*United in One Goal: Equal Opportunity and Mutual Respect*

**Ron DeSantis**
*Governor*



**Darrick McGhee**
*Chair*
**Cheyanne Costilla**
*Executive Director*

Aaron Abadi
82 Nassau Street, Apt. 140
New York, New York 10038

### Re: *Abadi v. Walt Disney World Parks and Resorts*
### FCHR No. 202231091

## NOTICE OF DISMISSAL

The Florida Commission on Human Relations (Commission) is in receipt of your complaint, alleging discrimination in violation of sections 760.01-760.11, *Florida Statutes*, the Florida Civil Rights Act. The Commission previously notified you that the information contained within your complaint was insufficient for the Commission to begin its investigation. Pursuant to Rule 60Y-5.001(7), Florida Administrative Code, you were provided an opportunity to address the insufficiencies within 60 days. Considering all information received, the Commission does not have authority to investigate, and the complaint will be dismissed. Pursuant to the authority vested in me by the Florida Statutes and Rule 60Y-5.006, Florida Administrative Code, I hereby dismiss the above-referenced complaint on behalf of the Florida Commission on Human Relations:

**FOR THE FLORIDA COMMISSION ON HUMAN RELATIONS:**

DATED: **Nov. 23**, 20 **21**

Cheyanne Costilla, Executive Director

## CERTIFICATE OF FILING AND SERVICE

I HEREBY CERTIFY that a copy of the foregoing NOTICE OF DISMISSAL was filed at Tallahassee, Florida and served upon the above-named addressees this __23rd__ day of __November__, 20__21__, by U.S. Mail.

BY: __Tammy Barton__
Clerk of the Commission

*RIGHT TO APPEAL: Pursuant to Rule 60Y-4.031, Florida Administrative Code, you have the right to seek judicial review of this decision. The Commission and the appropriate District Court of Appeal must receive your Notice of Appeal within 30 days of the date of this Notice. Explanation of the right to appeal is found in §120.68, Florida Statutes, and Rule 9.110, Florida Rules of Appellate Procedure.*

### COMMISSIONERS

| | | | |
|---|---|---|---|
| **Monica Cepero** *Fort Lauderdale* | **Libby Farmer** *Tallahassee* | **Mario Garza** *Lakewood Ranch* | **Dawn Hanson** *Tallahassee* |
| **Larry Hart** *Fort Myers* | **Darrick McGhee** *Chair* *Tallahassee* | **Kenyetta Mullins Moyé** *Tallahassee* | **Vivian Myrtetus** *Miami* |
| **Pamela Payne** *Jacksonville* | **Jay Pichard** *Tallahassee* | **Angela Primiano** *Vice Chair* *Hollywood* | |

**aa@neg.com**

| | |
|---|---|
| **From:** | WDW Guest Services <guest.services@disneyworld.com> |
| **Sent:** | Sunday, September 5, 2021 5:30 PM |
| **To:** | Aaron Abadi |
| **Subject:** | Re: Email from the Walt Disney World Resort |

## Jared Fields (Disney Parks)

Sep 5, 2021, 5:29 PM EDT

Dear Aaron,

Thank you for reaching out to us about the current face coverings requirement at our Resort.

Face coverings are required for all Guests (ages 2 and up) in all indoor locations, regardless of vaccination status. This includes upon entering and throughout all indoor attractions and indoor queues and in Disney buses, monorail and Disney Skyliner, regardless of vaccination status. Face coverings are optional for Guests in outdoor areas.

I recommend that you continue checking our 'Know Before You Go' website https://disneyworld.disney.go.com/experience-updates/ for the most up-to-date information regarding the face coverings requirement.

Please know that our face coverings requirement is not in violation of the Americans with Disabilities Act (ADA), which we continue to follow in our accessibility policies. At this time, when individuals do not wear a face covering at the Walt Disney World Resort, it compromises the health and safety of other Guests and our Cast, and the ADA does not require accommodations that pose a direct threat to the safety of others.

We understand that these times are challenging, and we appreciate everyone's cooperation and patience as we navigate as responsibly as we can. We are focused on consistent health and safety measures. I am truly sorry for how this may affect your family's vacation plans. If you have any further questions, I'm traditionally in the office on Sunday, Monday, Wednesday, and Thursday from 9:00 a.m. to 5:00 p.m. ET and can be reached by calling 407-828-1376.

Aaron, thank you for your understanding and we hope you are able to visit the park with your family when these necessary precautions are lifted.

Kind regards,

Jared Fields
Guest Experience Services
Walt Disney World Resort
407–828–1376

## Aaron Abadi

Aug 27, 2021, 3:01 PM EDT

 I have a medical disability, specifically a sensory processing disorder, and I cannot wear a mask or a face shield. Attached is a copy of the letter from my doctor confirming the above, and attesting to the fact that I already had Covid. I am no longer a health risk.

It is my understanding, that at your parks and facilities you require people to wear a mask currently.
I would like to come to the park with my children, and to be accommodated so that I don't have to wear a mask. CDC guidelines and all state mandates exempt someone like me from wearing a mask when the mandates were in effect. Federal ADA laws require that a person with a disability is accommodated.

Please confirm that if I booked a trip to Disney World or Disneyland, that I will be accommodated appropriately.

Much appreciated,


Aaron Abadi
CEO
National Environmental Group
Cell # 516–639–4100



Attachment(s)
[NYU Langone Health MyChart – Letter re mask.pdf](NYU Langone Health MyChart – Letter re mask.pdf)



## State of Florida
# Florida Commission on Human Relations

*An Equal Opportunity Employer • Affirmative Action Employer*

4075 Esplanade Way • Room 110 • Tallahassee, Florida 32399-7020
(850) 488-7082 / FAX: (850) 487-1007
http://fchr.state.fl.us
*United in One Goal: Equal Opportunity and Mutual Respect*

**Ron DeSantis**
*Governor*



**Mario Garza**
*Chair*
**Cheyanne Costilla**
*Executive Director*

Aaron Abadi
Delivered by email to
aa@neg.com

**Re: Abadi v. Walt Disney World Parks and Resorts**
**FCHR No. 202231091**

### NOTICE OF RIGHT TO AMEND

The Florida Commission on Human Relations (Commission) is in receipt of your complaint alleging Respondent discriminated against you in violation of sections 760.01-760.11, Florida Statutes, the Florida Civil Rights Act (Act). The information you submitted in the complaint is insufficient for the Commission to begin its investigation for the reasons stated below.

**The complaint is unclear with regard to whether discrimination had occurred, You did not visit the public accommodation, so it is unclear how you were denied services.**

Although your complaint is insufficient for the Commission to launch an investigation, it may be possible for you to amend your complaint. Pursuant to Rule 60Y-5.001(7), Florida Administrative Code, a complaint may be amended within 60 days after the initial filing to cure technical defects and omissions and to clarify and amplify allegations.

If you wish to amend this complaint please contact **Mary Smith** as soon as possible at the address and phone number listed above. **You have until November 06, 2021 to amend your complaint.\***

Sincerely,

John Scotese, Esq.
Attorney for the Florida Commission on Human Relations
*\* Be advised, a complaint of discrimination must be filed with the Commission within 365 days of the last alleged date of harm. The 60-day amendment period does not extend the 365-day filing deadline, and a delay may result in the complaint being untimely.*

### COMMISSIONERS

| | | | |
|---|---|---|---|
| **Monica Cepero** | **Libby Farmer** | **Mario Garza** *Chair* | **Dawn Hanson** |
| *Fort Lauderdale* | *Tallahassee* | *Lakewood Ranch* | *Tallahassee* |
| **Larry Hart** | **Darrick McGhee** *Vice Chair* | **Kenyetta Mullins Moye** | **Vivian Myrtetus** |
| *Fort Myers* | *Tallahassee* | *Tallahassee* | *Miami* |
| **Pamela Payne** | **Jay Pichard** | **Angela Primiano** | |
| *Jacksonville* | *Tallahassee* | *Hollywood* | |

**aa@neg.com**

| | |
|---|---|
| **From:** | aa@neg.com |
| **Sent:** | Saturday, November 6, 2021 3:09 PM |
| **To:** | fchrinfo@fchr.myflorida.com; 'John Scotese' |
| **Cc:** | aa@neg.com |
| **Subject:** | RE: Abadi Vs Disney FCHR, Case No. 202231091 |

I have not heard back from anyone.
Is there an appeals process for me to appeal this decision, or is my only recourse to file a writ of mandamus.
Please help me understand what my next step needs to be.
So far, you have not responded to my emails.
I'm baffled as to why that would be. Is there some connection to Disney that requires you to protect them?!
I surely hope not.
You are a "human rights" commission, with emphasis on human. Please respond and address my issue.

Thank you,

Aaron Abadi


**From:** aa@neg.com <aa@neg.com>
**Sent:** Wednesday, October 27, 2021 2:56 AM
**To:** 'fchrinfo@fchr.myflorida.com' <fchrinfo@fchr.myflorida.com>
**Subject:** Abadi Vs Disney FCHR, Case No. 202231091

Please let me know if this is being processed.
Thank you!
Aaron Abadi


**From:** aa@neg.com <aa@neg.com>
**Sent:** Thursday, October 21, 2021 6:19 PM
**To:** 'fchrinfo@fchr.myflorida.com' <fchrinfo@fchr.myflorida.com>
**Subject:** FW: Important information from FCHR, Case No. 202231091

No one responded to this.
Please let me know if you will be starting an investigation into my claim.

Thank you,

Aaron Abadi

**From:** aa@neg.com <aa@neg.com>
**Sent:** Tuesday, October 5, 2021 5:51 PM
**To:** 'John Scotese' <John.Scotese@fchr.myflorida.com>
**Cc:** 'aa@neg.com' <aa@neg.com>
**Subject:** RE: Important information from FCHR, Case No. 202231091

Thank you, Mr. Scotese.
Attached is a copy of the correspondence mentioned in the complaint.

I asked Disney if I can come and stay at their hotels and play at their parks, even though I cannot wear a mask because of a disability.
They responded that even though I had a disability, I would have to wear a mask and there would be no exemption.
They are saying very clearly that If I come, I will not be allowed in.

I think that is pretty clearly denying me access to the facility. Do I really need to go there and then get thrown out?

If a public accommodation were to tell all people with wheelchairs cannot come into our facility, if they were to email them directly and say "you cannot come because you're in a wheelchair," would that not be discrimination?!

I am a bit confused.  I will gladly amend it if that is what is necessary, but I'm wondering if maybe you missed something in my complaint.

Much appreciated for all your help.

Thank you,

Aaron Abadi

---

**From:** John Scotese <John.Scotese@fchr.myflorida.com>
**Sent:** Tuesday, October 5, 2021 3:16 PM
**To:** aa@neg.com
**Subject:** Important information from FCHR, Case No. 202231091

Good day.
I am a Senior Attorney with the Florida Commission on Human Relations.  **Attached, please find an important letter relating to the above-referenced case.  Please follow all directions contained within the letter**. <u>If you have any questions, please contact the Regulatory Specialist named in the letter.</u>  The Regulatory Specialist can be reached by <u>calling the main telephone number contained within the letterhead of the attached letter. You may also contact the Regulatory Specialist by mail or fax. The mailing address and fax number are also contained within the letterhead of the attached letter.</u>  Thank you for your attention to this matter.
Sincerely,
John Scotese
Senior Attorney
Florida Commission on Human Relations
4075 Esplanade Way, Room 110
Tallahassee, Florida 32399-7020

850-907-6823 - Office Line
850-487-1007 – FAX

*United in One Goal: Equal Opportunity and Mutual Respect*



*Correspondence made or received in connection with the transaction of official business by a state agency, unless exempt or made confidential by law, is considered a public record and may be subject to disclosure upon request.*

Name: Aaron Abadi | DOB: ███████ | MRN: 9141633 | PCP: Yelena Karasina, MD

# Letter Details



**Yelena Karasina, MD**
**NYU LANGONE AMBULATORY CARE WEST SIDE**
355 WEST 52ND ST
NEW YORK NY 10019-6239
Phone: 646-754-2100
Fax: 646-754-2148

December 3, 2020

Patient:    **Mr. Aaron Abadi**
Date of Birth: ███████
Date of Visit: **12/3/2020**

To Whom it May Concern:

Mr. Aaron Abadi is suffering from extreme sensitivity to touch,mostly in the area of his head.For this reason he is unable to wear face mask or face shield,and should not be required to do so.
He has already recovered from COVID,and is not contagious.

Sincerely,

Yelena Karasina, MD

*This letter was initially viewed by Aaron Abadi at 12/7/2020 9:41 AM.*

MyChart® licensed from Epic Systems Corporation © 1999 - 2021

 

## COVID-19

# Reinfection with COVID-19

Updated Aug. 6, 2021        Print

Cases of reinfection with COVID-19 have been reported, but remain rare.

In general, reinfection means a person was infected (got sick) once, recovered, and then later became infected again. Based on what we know from similar viruses, some reinfections are expected. We are still learning more about COVID-19. Ongoing COVID-19 studies will help us understand:

- How likely is reinfection
- How often reinfection occurs
- How soon after the first infection can reinfection take place
- How severe are cases of reinfection
- Who might be at higher risk for reinfection
- What reinfection means for a person's immunity
- If a person is able to spread COVID-19 to other people when reinfected

## Delta Variant

The Delta variant causes more infections and spreads faster than earlier forms of the virus that causes COVID-19. It might cause more severe illness than previous strains in unvaccinated people.

- Vaccines continue to reduce a person's risk of contracting the virus that cause COVID-19, including this variant.
- Vaccines continue to be highly effective at preventing hospitalization and death, including against this variant.
- Fully vaccinated people with breakthrough infections from this variant appear to be infectious for a shorter period.
- Get vaccinated and wear masks indoors in public spaces to reduce the spread of this variant.

About the Delta Variant        Variants in the US

# What CDC is doing

CDC is actively working to learn more about reinfection to inform public health action. CDC developed recommendations for public health professionals to help decide when and how to test someone for suspected reinfection. CDC has also provided information for state and local health departments to help investigate suspected cases of reinfection. We will update this guidance as we learn more about reinfection.

## Important Ways to Slow the Spread of COVID-19

- Get a COVID-19 vaccine as soon as you can. Find a vaccine.
- Wear a mask that covers your nose and mouth to help protect yourself and others.
- Stay 6 feet apart from others who don't live with you.
- Avoid crowds and poorly ventilated indoor spaces.
- Wash your hands often with soap and water. Use hand sanitizer if soap and water aren't available.

## More Information

How to Protect Yourself & Others

How Do I Find a COVID-19 Vaccine?

About Variants of the Virus that Causes COVID-19 | CDC

Choosing Safer Activities | CDC

Last Updated Aug. 6, 2021